(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KIRTSAENG, DBA BLUECHRISTINE99 *v.* JOHN WILEY & SONS, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 11–697. Argued October 29, 2012—Decided March 19, 2013

The "exclusive rights" that a copyright owner has "to distribute copies . . . of [a] copyrighted work," 17 U. S. C. §106(3), are qualified by the application of several limitations set out in §§107 through 122, including the "first sale" doctrine, which provides that "the owner of a particular copy or phonorecord lawfully made under this title . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord," §109(a). Importing a copy made abroad without the copyright owner's permission is an infringement of §106(3). See §602(a)(1). In *Quality King Distributors, Inc.* v. *L'anza Research Int'l, Inc.,* 523 U. S. 135, 145, this Court held that §602(a)(1)'s reference to §106(3) incorporates the §§107 through 122 limitations, including §109's "first sale" doctrine. However, the copy in *Quality King* was initially manufactured in the United States and then sent abroad and sold.

Respondent, John Wiley & Sons, Inc., an academic textbook publisher, often assigns to its wholly owned foreign subsidiary (Wiley Asia) rights to publish, print, and sell foreign editions of Wiley's English language textbooks abroad. Wiley Asia's books state that they are not to be taken (without permission) into the United States. When petitioner Kirtsaeng moved from Thailand to the United States to study mathematics, he asked friends and family to buy foreign edition English-language textbooks in Thai book shops, where they sold at low prices, and to mail them to him in the United States. He then sold the books, reimbursed his family and friends, and kept the profit.

Wiley filed suit, claiming that Kirtsaeng's unauthorized importation and resale of its books was an infringement of Wiley's §106(3)

exclusive right to distribute and §602's import prohibition. Kirtsaeng replied that because his books were "lawfully made" and acquired legitimately, §109(a)'s "first sale" doctrine permitted importation and resale without Wiley's further permission. The District Court held that Kirtsaeng could not assert this defense because the doctrine does not apply to goods manufactured abroad. The jury then found that Kirtsaeng had willfully infringed Wiley's American copyrights and assessed damages. The Second Circuit affirmed, concluding that §109(a)'s "lawfully made under this title" language indicated that the "first sale" doctrine does not apply to copies of American copyrighted works manufactured abroad.

*Held*: The "first sale" doctrine applies to copies of a copyrighted work lawfully made abroad. Pp. 7–33.

(a) Wiley reads "lawfully made under this title" to impose a *geographical* limitation that prevents §109(a)'s doctrine from applying to Wiley Asia's books. Kirtsaeng, however, reads the phrase as imposing the *non*-geographical limitation made "in accordance with" or "in compliance with" the Copyright Act, which would permit the doctrine to apply to copies manufactured abroad with the copyright owner's permission. Pp. 7–8.

(b) Section 109(a)'s language, its context, and the "first sale" doctrine's common-law history favor Kirtsaeng's reading. Pp. 8–24.

(1) Section 109(a) says nothing about geography. "Under" can logically mean "in accordance with." And a nongeographical interpretation provides each word in the phrase "lawfully made under this title" with a distinct purpose: "lawfully made" suggests an effort to distinguish copies that were made lawfully from those that were not, and "under this title" sets forth the standard of "lawful[ness]" (*i.e.,* the U. S. Copyright Act). This simple reading promotes the traditional copyright objective of combatting piracy and makes word-by-word linguistic sense.

In contrast, the geographical interpretation bristles with linguistic difficulties. Wiley first reads "under" to mean "in conformance with the Copyright Act *where the Copyright Act is applicable.*" Wiley then argues that the Act "is applicable" only in the United States. However, neither "under" nor any other word in "lawfully made under this title" means "where." Nor can a geographical limitation be read into the word "applicable." The fact that the Act does not instantly protect an American copyright holder from unauthorized piracy taking place abroad does not mean the Act is inapplicable to copies made abroad. Indeed, §602(a)(2) makes foreign-printed pirated copies subject to the Copyright Act. And §104 says that works "subject to protection" include unpublished works "without regard to the [author's] nationality or domicile," and works "first published" in any of the

nearly 180 nations that have signed a copyright treaty with the United States. Pp. 8–12.

(2) Both historical and contemporary statutory context indicate that Congress did not have geography in mind when writing the present version of §109(a). A comparison of the language in §109(a)'s predecessor and the present provision supports this conclusion. The former version referred to those who are not owners of a copy, but mere possessors who "lawfully obtained" a copy, while the present version covers only owners of a "lawfully made" copy. This new language, including the five words at issue, makes clear that a lessee of a copy will not receive "first sale" protection but one who owns a copy will be protected, provided that the copy was "lawfully made." A nongeographical interpretation is also supported by other provisions of the present statute. For example, the "manufacturing clause," which limited importation of many copies printed outside the United States, was phased out in an effort to equalize treatment of copies made in America and copies made abroad. But that "equal treatment" principle is difficult to square with a geographical interpretation that would grant an American copyright holder permanent control over the American distribution chain in respect to copies printed abroad but not those printed in America. Finally, the Court normally presumes that the words "lawfully made under this title" carry the same meaning when they appear in different but related sections, and it is unlikely that Congress would have intended the consequences produced by a geographical interpretation. Pp. 12–16.

(3) A nongeographical reading is also supported by the canon of statutory interpretation that "when a statute covers an issue previously governed by the common law," it is presumed that "Congress intended to retain the substance of the common law." *Samantar* v. *Yousuf*, 560 U. S. \_\_\_, \_\_\_. The common-law "first sale" doctrine, which has an impeccable historic pedigree, makes no geographical distinctions. Nor can such distinctions be found in *Bobbs-Merrill Co.* v. *Straus*, 210 U. S. 339, where this Court first applied the "first sale" doctrine, or in §109(a)'s predecessor provision, which Congress enacted a year later. Pp. 17–19.

(4) Library associations, used-book dealers, technology companies, consumer-goods retailers, and museums point to various ways in which a geographical interpretation would fail to further basic constitutional copyright objectives, in particular "promot[ing] the Progress of Science and useful Arts," Art. I, §8, cl. 8. For example, a geographical interpretation of the first-sale doctrine would likely require libraries to obtain permission before circulating the many books in their collections that were printed overseas. Wiley counters that such problems have not occurred in the 30 years since a federal court

first adopted a geographical interpretation.  But the law has not been
settled for so long in Wiley's favor.  The Second Circuit in this case
was the first Court of Appeals to adopt a purely geographical inter-
pretation.  Reliance on the "first sale" doctrine is also deeply embed-
ded in the practices of booksellers, libraries, museums, and retailers,
who have long relied on its protection.  And the fact that harm has
proved limited so far may simply reflect the reluctance of copyright
holders to assert geographically based resale rights.  Thus, the prac-
tical problems described by petitioner and his *amici* are too serious,
extensive, and likely to come about to be dismissed as insignificant—
particularly in light of the ever-growing importance of foreign trade
to America.  Pp. 19–24.

    (c) Several additional arguments that Wiley and the dissent make
in support of a geographical interpretation are unpersuasive.  Pp. 24–
33.

654 F. 3d 210, reversed and remanded.

BREYER, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and THOMAS, ALITO, SOTOMAYOR, and KAGAN, JJ., joined.  KAGAN,
J., filed a concurring opinion, in which ALITO, J., joined.  GINSBURG, J.,
filed a dissenting opinion, in which KENNEDY, J., joined, and in which
SCALIA, J., joined except as to Parts III and V–B–1.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–697

SUPAP KIRTSAENG, DBA BLUECHRISTINE99, PETITIONER *v.* JOHN WILEY & SONS, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[March 19, 2013]

JUSTICE BREYER delivered the opinion of the Court.

Section 106 of the Copyright Act grants "the owner of copyright under this title" certain "exclusive rights," including the right "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership." 17 U. S. C. §106(3). These rights are qualified, however, by the application of various limitations set forth in the next several sections of the Act, §§107 through 122. Those sections, typically entitled "Limitations on exclusive rights," include, for example, the principle of "fair use" (§107), permission for limited library archival reproduction, (§108), and the doctrine at issue here, the "first sale" doctrine (§109).

Section 109(a) sets forth the "first sale" doctrine as follows:

"Notwithstanding the provisions of section 106(3) [the section that grants the owner exclusive distribution rights], the owner of a particular copy or phonorecord *lawfully made under this title* . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or

phonorecord."  (Emphasis added.)

Thus, even though §106(3) forbids distribution of a copy of, say, the copyrighted novel Herzog without the copyright owner's permission, §109(a) adds that, once a copy of Herzog has been lawfully sold (or its ownership otherwise lawfully transferred), the buyer of *that copy* and subsequent owners are free to dispose of it as they wish.  In copyright jargon, the "first sale" has "exhausted" the copyright owner's §106(3) exclusive distribution right.

What, however, if the copy of Herzog was printed abroad and then initially sold with the copyright owner's permission?  Does the "first sale" doctrine still apply?  Is the buyer, like the buyer of a domestically manufactured copy, free to bring the copy into the United States and dispose of it as he or she wishes?

To put the matter technically, an "importation" provision, §602(a)(1), says that

> "[i]mportation into the United States, without the authority of the owner of copyright under this title, of copies . . . of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies . . . *under section 106 . . . .*"  17 U. S. C. §602(a)(1) (2006 ed., Supp. V) (emphasis added).

Thus §602(a)(1) makes clear that importing a copy without permission violates the owner's exclusive distribution right.  But in doing so, §602(a)(1) refers explicitly to the *§106(3)* exclusive distribution right.  As we have just said, §106 is by its terms "[s]ubject to" the various doctrines and principles contained in §§107 through 122, including §109(a)'s "first sale" limitation.  Do those same modifications apply—in particular, does the "first sale" modification apply—when considering whether §602(a)(1) prohibits importing a copy?

In *Quality King Distributors, Inc.* v. *L'anza Research*

*Int'l, Inc.,* 523 U. S. 135, 145 (1998), we held that §602(a)(1)'s reference to §106(3)'s exclusive distribution right incorporates the later subsections' limitations, including, in particular, the "first sale" doctrine of §109. Thus, it might seem that, §602(a)(1) notwithstanding, one who buys a copy abroad can freely import that copy into the United States and dispose of it, just as he could had he bought the copy in the United States.

But *Quality King* considered an instance in which the copy, though purchased abroad, was initially manufactured in the United States (and then sent abroad and sold). This case is like *Quality King* but for one important fact. The copies at issue here were manufactured abroad. That fact is important because §109(a) says that the "first sale" doctrine applies to "a particular copy or phonorecord *lawfully made under this title.*" And we must decide here whether the five words, "lawfully made under this title," make a critical legal difference.

Putting section numbers to the side, we ask whether the "first sale" doctrine applies to protect a buyer or other lawful owner of a copy (of a copyrighted work) lawfully manufactured abroad. Can that buyer bring that copy into the United States (and sell it or give it away) without obtaining permission to do so from the copyright owner? Can, for example, someone who purchases, say at a used bookstore, a book printed abroad subsequently resell it without the copyright owner's permission?

In our view, the answers to these questions are, yes. We hold that the "first sale" doctrine applies to copies of a copyrighted work lawfully made abroad.

## I

### A

Respondent, John Wiley & Sons, Inc., publishes academic textbooks. Wiley obtains from its authors various foreign and domestic copyright assignments, licenses and

permissions—to the point that we can, for present purposes, refer to Wiley as the relevant American copyright owner. See 654 F. 3d 210, 213, n. 6 (CA2 2011). Wiley often assigns to its wholly owned foreign subsidiary, John Wiley & Sons (Asia) Pte Ltd., rights to publish, print, and sell Wiley's English language textbooks abroad. App. to Pet. for Cert. 47a–48a. Each copy of a Wiley Asia foreign edition will likely contain language making clear that the copy is to be sold only in a particular country or geographical region outside the United States. 654 F. 3d, at 213.

For example, a copy of Wiley's American edition says, "Copyright © 2008 John Wiley & Sons, Inc. All rights reserved. . . . Printed in the United States of America." J. Walker, Fundamentals of Physics, p. vi (8th ed. 2008). A copy of Wiley Asia's Asian edition of that book says:

> "Copyright © 2008 John Wiley & Sons (Asia) Pte Ltd[.] All rights reserved. This book is authorized for sale in Europe, Asia, Africa, and the Middle East only and may be not exported out of these territories. Exportation from or importation of this book to another region without the Publisher's authorization is illegal and is a violation of the Publisher's rights. The Publisher may take legal action to enforce its rights. . . . Printed in Asia." J. Walker, Fundamentals of Physics, p. vi (8th ed. 2008 Wiley Int'l Student ed.).

Both the foreign and the American copies say:

> "No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means . . . except as permitted under Sections 107 or 108 of the 1976 United States Copyright Act." Compare, *e.g., ibid.* (Int'l ed.), with Walker, *supra,* at vi (American ed.).

The upshot is that there are two essentially equivalent versions of a Wiley textbook, 654 F. 3d, at 213, each ver-

sion manufactured and sold with Wiley's permission: (1) an American version printed and sold in the United States, and (2) a foreign version manufactured and sold abroad. And Wiley makes certain that copies of the second version state that they are not to be taken (without permission) into the United States. *Ibid.*

Petitioner, Supap Kirtsaeng, a citizen of Thailand, moved to the United States in 1997 to study mathematics at Cornell University. *Ibid.* He paid for his education with the help of a Thai Government scholarship which required him to teach in Thailand for 10 years on his return. Brief for Petitioner 7. Kirtsaeng successfully completed his undergraduate courses at Cornell, successfully completed a Ph. D. program in mathematics at the University of Southern California, and then, as promised, returned to Thailand to teach. *Ibid.* While he was studying in the United States, Kirtsaeng asked his friends and family in Thailand to buy copies of foreign edition English-language textbooks at Thai book shops, where they sold at low prices, and mail them to him in the United States. *Id.,* at 7–8. Kirtsaeng would then sell them, reimburse his family and friends, and keep the profit. App. to Pet. for Cert. 48a–49a.

### B

In 2008 Wiley brought this federal lawsuit against Kirtsaeng for copyright infringement. 654 F. 3d, at 213. Wiley claimed that Kirtsaeng's unauthorized importation of its books and his later resale of those books amounted to an infringement of Wiley's §106(3) exclusive right to distribute as well as §602's related import prohibition. 17 U. S. C. §§106(3) (2006 ed.), 602(a) (2006 ed., Supp. V). See also §501 (2006 ed.) (authorizing infringement action). App. 204–211. Kirtsaeng replied that the books he had acquired were "'lawfully made'" and that he had acquired them legitimately. Record in No. 1:08–CV–7834–DCP

(SDNY), Doc. 14, p. 3.  Thus, in his view, §109(a)'s "first sale" doctrine permitted him to resell or otherwise dispose of the books without the copyright owner's further permission.  *Id.*, at 2–3.

The District Court held that Kirtsaeng could not assert the "first sale" defense because, in its view, that doctrine does not apply to "foreign-manufactured goods" (even if made abroad with the copyright owner's permission).  App. to Pet. for Cert. 72a.  The jury then found that Kirtsaeng had willfully infringed Wiley's American copyrights by selling and importing without authorization copies of eight of Wiley's copyrighted titles.  And it assessed statutory damages of $600,000 ($75,000 per work).  654 F. 3d, at 215.

On appeal, a split panel of the Second Circuit agreed with the District Court.  *Id.,* at 222.  It pointed out that §109(a)'s "first sale" doctrine applies only to "the owner of a particular copy . . . *lawfully made under this title.*"  *Id.,* at 218–219 (emphasis added).  And, in the majority's view, this language means that the "first sale" doctrine does not apply to copies of American copyrighted works manufactured abroad.  *Id.,* at 221.  A dissenting judge thought that the words "lawfully made under this title" do not refer "to a place of manufacture" but rather "focu[s] on whether a particular copy was manufactured lawfully under" America's copyright statute, and that "the lawfulness of the manufacture of a particular copy should be judged by U. S. copyright law."  *Id.*, at 226 (opinion of Murtha, J.).

We granted Kirtsaeng's petition for certiorari to consider this question in light of different views among the Circuits.  Compare *id.,* at 221 (case below) ("first sale" doctrine does not apply to copies manufactured outside the United States), with *Omega S. A.* v. *Costco Wholesale Corp.*, 541 F. 3d 982, 986 (CA9 2008) ("first sale" doctrine applies to copies manufactured outside the United States only if an authorized first sale occurs within the United

States), aff'd by an equally divided court, 562 U. S. \_\_\_ (2010), and *Sebastian Int'l, Inc.* v. *Consumer Contacts (PTY) Ltd.*, 847 F. 2d 1093, 1098, n. 1 (CA3 1988) (limitation of the first sale doctrine to copies made within the United States "does not fit comfortably within the scheme of the Copyright Act").

## II

We must decide whether the words "lawfully made under this title" restrict the scope of §109(a)'s "first sale" doctrine geographically. The Second Circuit, the Ninth Circuit, Wiley, and the Solicitor General (as *amicus*) all read those words as imposing a form of *geographical* limitation. The Second Circuit held that they limit the "first sale" doctrine to particular copies "made in territories *in which the Copyright Act is law*," which (the Circuit says) are copies "manufactured domestically," not "outside of the United States." 654 F. 3d, at 221–222 (emphasis added). Wiley agrees that those five words limit the "first sale" doctrine "to copies made in conformance with the [United States] Copyright Act *where the Copyright Act is applicable*," which (Wiley says) means it does not apply to copies made "outside the United States" and at least not to "foreign production of a copy for distribution exclusively abroad." Brief for Respondent 15–16. Similarly, the Solicitor General says that those five words limit the "first sale" doctrine's applicability to copies "'*made subject to* and in compliance with [the Copyright Act],'" which (the Solicitor General says) are copies "made in the United States." Brief for United States as *Amicus Curiae* 5 (hereinafter Brief for United States) (emphasis added). And the Ninth Circuit has held that those words limit the "first sale" doctrine's applicability (1) to copies lawfully made in the United States, and (2) to copies lawfully made outside the United States but initially sold in the United States with the copyright owner's permission. *Denbicare*

*U. S. A. Inc.* v. *Toys "R" Us, Inc.*, 84 F. 3d 1143, 1149–1150 (1996).

Under any of these geographical interpretations, §109(a)'s "first sale" doctrine would not apply to the Wiley Asia books at issue here. And, despite an American copyright owner's permission to *make* copies abroad, one who *buys* a copy of any such book or other copyrighted work—whether at a retail store, over the Internet, or at a library sale—could not resell (or otherwise dispose of) that particular copy without further permission.

Kirtsaeng, however, reads the words "lawfully made under this title" as imposing a *non*-geographical limitation. He says that they mean made "in accordance with" or "in compliance with" the Copyright Act. Brief for Petitioner 26. In that case, §109(a)'s "first sale" doctrine would apply to copyrighted works as long as their manufacture met the requirements of American copyright law. In particular, the doctrine would apply where, as here, copies are manufactured abroad with the permission of the copyright owner. See §106 (referring to the owner's right to authorize).

In our view, §109(a)'s language, its context, and the common-law history of the "first sale" doctrine, taken together, favor a *non*-geographical interpretation. We also doubt that Congress would have intended to create the practical copyright-related harms with which a geographical interpretation would threaten ordinary scholarly, artistic, commercial, and consumer activities. See Part II–D, *infra.* We consequently conclude that Kirtsaeng's nongeographical reading is the better reading of the Act.

A

The language of §109(a) read literally favors Kirtsaeng's nongeographical interpretation, namely, that "lawfully made under this title" means made "in accordance with" or "in compliance with" the Copyright Act. The language of

§109(a) says nothing about geography. The word "under" can mean "[i]n accordance with." 18 Oxford English Dictionary 950 (2d ed. 1989). See also Black's Law Dictionary 1525 (6th ed. 1990) ("according to"). And a nongeographical interpretation provides each word of the five-word phrase with a distinct purpose. The first two words of the phrase, "lawfully made," suggest an effort to distinguish those copies that were made lawfully from those that were not, and the last three words, "under this title," set forth the standard of "lawful[ness]." Thus, the nongeographical reading is simple, it promotes a traditional copyright objective (combatting piracy), and it makes word-by-word linguistic sense.

The geographical interpretation, however, bristles with linguistic difficulties. It gives the word "lawfully" little, if any, linguistic work to do. (How could a book be *un*lawfully "made under this title"?) It imports geography into a statutory provision that says nothing explicitly about it. And it is far more complex than may at first appear.

To read the clause geographically, Wiley, like the Second Circuit and the Solicitor General, must first emphasize the word "under." Indeed, Wiley reads "under this title" to mean "in conformance with the Copyright Act *where the Copyright Act is applicable*." Brief for Respondent 15. Wiley must then take a second step, arguing that the Act "is applicable" only in the United States. *Ibid.* And the Solicitor General must do the same. See Brief for United States 6 ("A copy is '*lawfully* made under this title' if Title 17 governs the copy's creation *and* the copy is made in compliance with Title 17's requirements"). See also *post,* at 7 (GINSBURG, J., dissenting) ("under" describes something "governed or regulated by another").

One difficulty is that neither "under" nor any other word in the phrase means "where." See, *e.g.*, 18 Oxford English Dictionary, *supra,* at 947–952 (definition of "under"). It might mean "subject to," see *post*, at 6, but as this

Court has repeatedly acknowledged, the word evades a uniform, consistent meaning. See *Kucana* v. *Holder*, 558 U. S. 233, 245 (2010) ("'under' is chameleon"); *Ardestani* v. *INS*, 502 U. S. 129, 135 (1991) ("under" has "many dictionary definitions" and "must draw its meaning from its context").

A far more serious difficulty arises out of the uncertainty and complexity surrounding the second step's effort to read the necessary geographical limitation into the word "applicable" (or the equivalent). Where, precisely, is the Copyright Act "applicable"? The Act does not instantly *protect* an American copyright holder from unauthorized piracy taking place abroad. But that fact does not mean the Act is *inapplicable* to copies made abroad. As a matter of ordinary English, one can say that a statute imposing, say, a tariff upon "any rhododendron grown in Nepal" applies to *all* Nepalese rhododendrons. And, similarly, one can say that the American Copyright Act is *applicable* to *all* pirated copies, including those printed overseas. Indeed, the Act itself makes clear that (in the Solicitor General's language) foreign-printed pirated copies are "subject to" the Act. §602(a)(2) (2006 ed., Supp. V) (referring to importation of copies "the making of which either constituted an infringement of copyright, or which would have constituted an infringement of copyright if this title had been applicable"); Brief for United States 5. See also *post,* at 6 (suggesting that "made under" may be read as "subject to").

The appropriateness of this linguistic usage is underscored by the fact that §104 of the Act itself says that works "*subject to protection under this title*" include unpublished works "without regard to the nationality or domicile of the author," and works "first published" in any one of the nearly 180 nations that have signed a copyright treaty with the United States. §§104(a), (b) (2006 ed.) (emphasis added); §101 (2006 ed., Supp. V) (defining

"treaty party"); U. S. Copyright Office, Circular No. 38A, International Copyright Relations of the United States (2010). Thus, ordinary English permits us to say that the Act "applies" to an Irish manuscript lying in its author's Dublin desk drawer as well as to an original recording of a ballet performance first made in Japan and now on display in a Kyoto art gallery. Cf. 4 M. Nimmer & D. Nimmer, Copyright §17.02, pp. 17–18, 17–19 (2012) (hereinafter Nimmer on Copyright) (noting that the principle that "copyright laws do not have any extraterritorial operation" "requires some qualification").

The Ninth Circuit's geographical interpretation produces still greater linguistic difficulty. As we said, that Circuit interprets the "first sale" doctrine to cover both (1) copies manufactured in the United States and (2) copies manufactured abroad but first sold in the United States with the American copyright owner's permission. *Denbicare U. S. A.*, 84 F. 3d, at 1149–1150. See also Brief for Respondent 16 (suggesting that the clause *at least* excludes "the foreign production of a copy for distribution exclusively abroad"); *id.,* at 51 (the Court need "not decide whether the copyright owner would be able to restrict further distribution" in the case of "a downstream domestic purchaser of *authorized* imports"); Brief for Petitioner in *Costco Wholesale Corp.* v. *Omega, S. A.*, O. T. 2010, No. 08–1423, p. 12 (excepting imported copies "made by unrelated foreign copyright holders" (emphasis deleted)).

We can understand why the Ninth Circuit may have thought it necessary to add the second part of its definition. As we shall later describe, see Part II–D, *infra*, without some such qualification a copyright holder could prevent a buyer from domestically reselling or even giving away copies of a video game made in Japan, a film made in Germany, or a dress fabric (with a design copyright) made in China, *even* if the copyright holder has granted permission for the foreign manufacture, importation, and an initial

domestic sale of the copy. A publisher such as Wiley would be free to print its books abroad, allow their importation and sale within the United States, but prohibit students from later selling their used texts at a campus bookstore. We see no way, however, to reconcile this half-geographical/half-nongeographical interpretation with the language of the phrase, "lawfully made under this title." As a matter of English, it would seem that those five words either do cover copies lawfully made abroad or they do not.

In sum, we believe that geographical interpretations create more linguistic problems than they resolve. And considerations of simplicity and coherence tip the purely linguistic balance in Kirtsaeng's, nongeographical, favor.

## B

Both historical and contemporary statutory context indicate that Congress, when writing the present version of §109(a), did not have geography in mind. In respect to history, we compare §109(a)'s present language with the language of its immediate predecessor. That predecessor said:

> "[N]othing in this Act shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work *the possession of which has been lawfully obtained.*" Copyright Act of 1909, §41, 35 Stat. 1084 (emphasis added).

See also Copyright Act of 1947, §27, 61 Stat. 660. The predecessor says nothing about geography (and Wiley does not argue that it does). So we ask whether Congress, in changing its language implicitly *introduced* a geographical limitation that previously was lacking. See also Part II–C, *infra* (discussing 1909 codification of common-law principle).

A comparison of language indicates that it did not. The

predecessor says that the "first sale" doctrine protects "the transfer of any copy *the possession of which has been lawfully obtained.*" The present version says that "*the owner* of a particular copy or phonorecord lawfully made under this title is entitled to sell or otherwise dispose of the possession of that copy or phonorecord." What does this change in language accomplish?

The language of the former version referred to those *who are not owners* of a copy, but mere possessors who "lawfully obtained" a copy. The present version covers only those who are *owners* of a "lawfully made" copy. Whom does the change leave out? Who might have lawfully *obtained* a copy of a copyrighted work but not *owned* that copy? One answer is owners of movie theaters, who during the 1970's (and before) often *leased* films from movie distributors or filmmakers. See S. Donahue, American Film Distribution 134, 177 (1987) (describing producer-distributer and distributer-exhibitor agreements); Note, The Relationship Between Motion Picture Distribution and Exhibition: An Analysis of the Effects of Anti-Blind Bidding Legislation, 9 Comm/Ent. L. J. 131, 135 (1986). Because the theater owners had "lawfully obtained" their copies, the earlier version could be read as allowing them to sell that copy, *i.e.*, it might have given them "first sale" protection. Because the theater owners were lessees, not owners, of their copies, the change in language makes clear that they (like bailees and other lessees) cannot take advantage of the "first sale" doctrine. (Those who find legislative history useful will find confirmation in, *e.g.*, House Committee on the Judiciary, Copyright Law Revision, Supplementary Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., pt. 6, p. 30 (Comm. Print 1965) (hereinafter Copyright Law Revision) ("[W]here a person has rented a print of a motion picture from the copyright owner, he would have no

right to lend, rent, sell, or otherwise dispose of the print without first obtaining the copyright owner's permission"). See also *Platt & Munk Co.* v. *Republic Graphics, Inc.*, 315 F. 2d 847, 851 (CA2 1963) (Friendly, J.) (pointing out predecessor statute's leasing problem)).

This objective perfectly well explains the new language of the present version, including the five words here at issue. Section 109(a) now makes clear that a lessee of a copy will *not* receive "first sale" protection but one who *owns* a copy *will* receive "first sale" protection, *provided,* of course, that the copy was *"lawfully made"* and not pirated. The new language also takes into account that a copy may be "lawfully made under this title" when the copy, say of a phonorecord, comes into its owner's possession through use of a compulsory license, which "this title" provides for elsewhere, namely, in §115. Again, for those who find legislative history useful, the relevant legislative report makes this clear. H. R. Rep. No. 94–1476, p. 79 (1976) ("For example, any resale of an illegally 'pirated' phonorecord would be an infringement, but the disposition of a phonorecord legally made under the compulsory licensing provisions of section 115 would not").

Other provisions of the present statute also support a nongeographical interpretation. For one thing, the statute phases out the "manufacturing clause," a clause that appeared in earlier statutes and had limited importation of many copies (of copyrighted works) printed outside the United States. §601, 90 Stat. 2588 ("Prior to July 1, 1982 . . . the importation into or public distribution in the United States of copies of a work consisting preponderantly of nondramatic literary material . . . is prohibited unless the portions consisting of such material have been manufactured in the United States or Canada"). The phasing out of this clause sought to equalize treatment of copies manufactured in America and copies manufactured abroad. See H. R. Rep. No. 94–1476, at 165–166.

The "equal treatment" principle, however, is difficult to square with a geographical interpretation of the "first sale" clause that would grant the holder of an American copyright (perhaps a foreign national, see *supra,* at 10) permanent control over the American distribution chain (sales, resales, gifts, and other distribution) in respect to copies printed abroad but not in respect to copies printed in America. And it is particularly difficult to believe that Congress would have sought this unequal treatment while saying nothing about it and while, in a related clause (the manufacturing phase-out), seeking the opposite kind of policy goal. Cf. *Golan* v. *Holder*, 565 U. S. ___, ___ (2012) (slip op., at 30) (Congress has moved from a copyright regime that, prior to 1891, entirely excluded foreign works from U. S. copyright protection to a regime that now "ensure[s] that most works, whether foreign or domestic, would be *governed by the same legal regime*" (emphasis added)).

Finally, we normally presume that the words "lawfully made under this title" carry the same meaning when they appear in different but related sections. *Department of Revenue of Ore.* v. *ACF Industries, Inc.*, 510 U. S. 332, 342 (1994). But doing so here produces surprising consequences. Consider:

(1) Section 109(c) says that, despite the copyright owner's exclusive right "to display" a copyrighted work (provided in §106(5)), the owner of a particular copy "lawfully made under this title" may publicly display it without further authorization. To interpret these words geographically would mean that one who buys a copyrighted work of art, a poster, or even a bumper sticker, in Canada, in Europe, in Asia, could not display it in America without the copyright owner's further authorization.

(2) Section 109(e) specifically provides that the owner of a particular copy of a copyrighted video arcade game "lawfully made under this title" may "publicly perform or display that game in coin-operated equipment" without the authorization of the copyright owner. To interpret these words geographically means that an arcade owner could not ("without the authority of the copyright owner") perform or display arcade games (whether new or used) originally made in Japan. Cf. *Red Baron-Franklin Park, Inc.* v. *Taito Corp.*, 883 F. 2d 275 (CA4 1989).

(3) Section 110(1) says that a teacher, without the copyright owner's authorization, is allowed to perform or display a copyrighted work (say, an audiovisual work) "in the course of face-to-face teaching activities"—unless the teacher knowingly used "a copy that was not lawfully made under this title." To interpret these words geographically would mean that the teacher could not (without further authorization) use a copy of a film during class if the copy was lawfully made in Canada, Mexico, Europe, Africa, or Asia.

(4) In its introductory sentence, §106 provides the Act's basic exclusive rights to an "owner of a copyright under this title." The last three words cannot support a geographic interpretation.

Wiley basically accepts the first three readings, but argues that Congress intended the restrictive consequences. And it argues that context simply requires that the words of the fourth example receive a different interpretation. Leaving the fourth example to the side, we shall explain in Part II–D, *infra,* why we find it unlikely that Congress would have intended these, and other related consequences.

### C

A relevant canon of statutory interpretation favors a nongeographical reading. "[W]hen a statute covers an issue previously governed by the common law," we must presume that "Congress intended to retain the substance of the common law." *Samantar* v. *Yousuf*, 560 U. S. \_\_\_, \_\_\_, n. 13 (2010) (slip op., at 14, n. 13). See also *Isbrandtsen Co.* v. *Johnson*, 343 U. S. 779, 783 (1952) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident").

The "first sale" doctrine is a common-law doctrine with an impeccable historic pedigree. In the early 17th century Lord Coke explained the common law's refusal to permit restraints on the alienation of chattels. Referring to Littleton, who wrote in the 15th century, Gray, Two Contributions to Coke Studies, 72 U. Chi. L. Rev. 1127, 1135 (2005), Lord Coke wrote:

> "[If] a man be possessed of . . . a horse, or of any other chattell . . . and give or sell his whole interest . . . therein upon condition that the Donee or Vendee shall not alien[ate] the same, the [condition] is voi[d], because his whole interest . . . is out of him, so as he hath no possibilit[y] of a Reverter, and it is against Trade and Traffi[c], and bargaining and contracting betwee[n] man and man: and it is within the reason of our Author that it should ouster him of all power given to him." 1 E. Coke, Institutes of the Laws of England §360, p. 223 (1628).

A law that permits a copyright holder to control the resale or other disposition of a chattel once sold is similarly "against Trade and Traffi[c], and bargaining and contracting." *Ibid.*

With these last few words, Coke emphasizes the im-

portance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of those goods. American law too has generally thought that competition, including freedom to resell, can work to the advantage of the consumer. See, *e.g.*, *Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U. S. 877, 886 (2007) (restraints with "manifestly anticompetitive effects" are *per se* illegal; others are subject to the rule of reason (internal quotation marks omitted)); 1 P. Areeda & H. Hovenkamp, Antitrust Law ¶100, p. 4 (3d ed. 2006) ("[T]he principal objective of antitrust policy is to maximize consumer welfare by encouraging firms to behave competitively").

The "first sale" doctrine also frees courts from the administrative burden of trying to enforce restrictions upon difficult-to-trace, readily movable goods. And it avoids the selective enforcement inherent in any such effort. Thus, it is not surprising that for at least a century the "first sale" doctrine has played an important role in American copyright law. See *Bobbs-Merrill Co.* v. *Straus*, 210 U. S. 339 (1908); Copyright Act of 1909, §41, 35 Stat. 1084. See also Copyright Law Revision, Further Discussions and Comments on Preliminary Draft for Revised U. S. Copyright Law, 88th Cong., 2d Sess., pt. 4, p. 212 (Comm. Print 1964) (Irwin Karp of Authors' League of America expressing concern for "the very basic concept of copyright law that, once you've sold a copy legally, you can't restrict its resale").

The common-law doctrine makes no geographical distinctions; nor can we find any in *Bobbs-Merrill* (where this Court first applied the "first sale" doctrine) or in §109(a)'s predecessor provision, which Congress enacted a year later. See *supra,* at 12. Rather, as the Solicitor General acknowledges, "a straightforward application of *Bobbs-Merrill*" would not preclude the "first sale" defense from applying to authorized copies made overseas. Brief for

United States 27. And we can find no language, context, purpose, or history that would rebut a "straightforward application" of that doctrine here.

The dissent argues that another principle of statutory interpretation works against our reading, and points out that elsewhere in the statute Congress used different words to express something like the non-geographical reading we adopt. *Post*, at 8–9 (quoting §602(a)(2) (prohibiting the importation of copies "the making of which either constituted an infringement of copyright, or which would have constituted an infringement of copyright if this title had been applicable" (emphasis deleted))). Hence, Congress, the dissent believes, must have meant §109(a)'s different language to mean something different (such as the dissent's own geographical interpretation of §109(a)). We are not aware, however, of any canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing. Regardless, were there such a canon, the dissent's interpretation of §109(a) would also violate it. That is because Congress elsewhere in the 1976 Act included the words "manufactured in the United States or Canada," 90 Stat. 2588, which express just about the same geographical thought that the dissent reads into §109(a)'s very different language.

## D

Associations of libraries, used-book dealers, technology companies, consumer-goods retailers, and museums point to various ways in which a geographical interpretation would fail to further basic constitutional copyright objectives, in particular "promot[ing] the Progress of Science and useful Arts." U. S. Const., Art. I, §8, cl. 8.

The American Library Association tells us that library collections contain at least 200 million books published abroad (presumably, many were first published in one of

the nearly 180 copyright-treaty nations and enjoy American copyright protection under 17 U. S. C. §104, see *supra*, at 10); that many others were first published in the United States but printed abroad because of lower costs; and that a geographical interpretation will likely require the libraries to obtain permission (or at least create significant uncertainty) before circulating or otherwise distributing these books.  Brief for American Library Association et al. as *Amici Curiae* 4, 15–20.  Cf. *id.,* at 16–20, 28 (discussing limitations of potential defenses, including the fair use and archival exceptions, §§107–108).  See also Library and Book Trade Almanac 511 (D. Bogart ed., 55th ed. 2010) (during 2000–2009 "a significant amount of book printing moved to foreign nations").

How, the American Library Association asks, are the libraries to obtain permission to distribute these millions of books?  How can they find, say, the copyright owner of a foreign book, perhaps written decades ago?  They may not know the copyright holder's present address.  Brief for American Library Association 15 (many books lack indication of place of manufacture; "no practical way to learn where [a] book was printed").  And, even where addresses can be found, the costs of finding them, contacting owners, and negotiating may be high indeed.  Are the libraries to stop circulating or distributing or displaying the millions of books in their collections that were printed abroad?

Used-book dealers tell us that, from the time when Benjamin Franklin and Thomas Jefferson built commercial and personal libraries of foreign books, American readers have bought used books published and printed abroad.  Brief for Powell's Books Inc. et al. as *Amici Curiae* 7 (citing M. Stern, Antiquarian Bookselling in the United States (1985)).  The dealers say that they have "operat[ed] . . . for centuries" under the assumption that the "first sale" doctrine applies.  Brief for Powell's Books 7.  But under a geographical interpretation a contemporary

tourist who buys, say, at Shakespeare and Co. (in Paris), a dozen copies of a foreign book for American friends might find that she had violated the copyright law. The used-book dealers cannot easily predict what the foreign copyright holder may think about a reader's effort to sell a used copy of a novel. And they believe that a geographical interpretation will injure a large portion of the used-book business.

Technology companies tell us that "automobiles, microwaves, calculators, mobile phones, tablets, and personal computers" contain copyrightable software programs or packaging. Brief for Public Knowledge et al. as *Amici Curiae* 10. See also Brief for Association of Service and Computer Dealers International, Inc., et al. as *Amici Curiae* 2. Many of these items are made abroad with the American copyright holder's permission and then sold and imported (with that permission) to the United States. Brief for Retail Litigation Center, Inc., et al. as *Amici Curiae* 4. A geographical interpretation would prevent the resale of, say, a car, without the permission of the holder of each copyright on each piece of copyrighted automobile software. Yet there is no reason to believe that foreign auto manufacturers regularly obtain this kind of permission from their software component suppliers, and Wiley did not indicate to the contrary when asked. See Tr. of Oral Arg. 29–30. Without that permission a foreign car owner could not sell his or her used car.

Retailers tell us that over $2.3 trillion worth of foreign goods were imported in 2011. Brief for Retail Litigation Center 8. American retailers buy many of these goods after a first sale abroad. *Id.*, at 12. And, many of these items bear, carry, or contain copyrighted "packaging, logos, labels, and product inserts and instructions for [the use of] everyday packaged goods from floor cleaners and health and beauty products to breakfast cereals." *Id.,* at 10–11. The retailers add that American sales of more

traditional copyrighted works, "such as books, recorded music, motion pictures, and magazines" likely amount to over $220 billion. *Id.,* at 9. See also *id.,* at 10 (electronic game industry is $16 billion). A geographical interpretation would subject many, if not all, of them to the disruptive impact of the threat of infringement suits. *Id.,* at 12.

Art museum directors ask us to consider their efforts to display foreign-produced works by, say, Cy Twombly, René Magritte, Henri Matisse, Pablo Picasso, and others. See *supra*, at 10 (describing how §104 often makes such works "subject to" American copyright protection). A geographical interpretation, they say, would require the museums to obtain permission from the copyright owners before they could display the work, see *supra,* at 15—even if the copyright owner has already sold or donated the work to a foreign museum. Brief for Association of Art Museum Directors et al. as *Amici Curiae* 10–11. What are the museums to do, they ask, if the artist retained the copyright, if the artist cannot be found, or if a group of heirs is arguing about who owns which copyright? *Id.,* at 14.

These examples, and others previously mentioned, help explain *why* Lord Coke considered the "first sale" doctrine necessary to protect "Trade and Traffi[c], and bargaining and contracting," and they help explain *why* American copyright law has long applied that doctrine. Cf. *supra,* at 17–18.

Neither Wiley nor any of its many *amici* deny that a geographical interpretation could bring about these "horribles"—at least in principle. Rather, Wiley essentially says that the list is artificially invented. Brief for Respondent 51–52. It points out that a federal court first adopted a geographical interpretation more than 30 years ago. *CBS, Inc.* v. *Scorpio Music Distributors, Inc.*, 569 F. Supp. 47, 49 (ED Pa. 1983), summarily aff'd, 738 F. 2d 424 (CA3 1984) (table). Yet, it adds, these problems have not occurred. Why not? Because, says Wiley, the prob-

lems and threats are purely theoretical; they are unlikely to reflect reality. See also *post*, at 30–31.

We are less sanguine. For one thing, the law has not been settled for long in Wiley's favor. The Second Circuit, in its decision below, is the first Court of Appeals to adopt a purely geographical interpretation. The Third Circuit has favored a nongeographical interpretation. *Sebastian Int'l,* 847 F. 2d 1093. The Ninth Circuit has favored a modified geographical interpretation with a nongeographical (but textually unsustainable) corollary designed to diminish the problem. *Denbicare U. S. A.,* 84 F. 3d 1143. See *supra,* at 11–12. And other courts have hesitated to adopt, and have cast doubt upon, the validity of the geographical interpretation. *Pearson Educ., Inc.* v. *Liu*, 656 F. Supp. 2d 407 (SDNY 2009); *Red-Baron Franklin Park, Inc.* v. *Taito Corp.*, No. 88–0156–A, 1988 WL 167344, \*3 (ED Va. 1988), rev'd on other grounds, 883 F. 2d 275 (CA4 1989).

For another thing, reliance upon the "first sale" doctrine is deeply embedded in the practices of those, such as booksellers, libraries, museums, and retailers, who have long relied upon its protection. Museums, for example, are not in the habit of asking their foreign counterparts to check with the heirs of copyright owners before sending, *e.g.*, a Picasso on tour. Brief for Association of Art Museum Directors 11–12. That inertia means a dramatic change is likely necessary before these institutions, instructed by their counsel, would begin to engage in the complex permission-verifying process that a geographical interpretation would demand. And this Court's adoption of the geographical interpretation could provide that dramatic change. These intolerable consequences (along with the absurd result that the copyright owner can exercise downstream control even when it authorized the import or first sale) have understandably led the Ninth Circuit, the Solicitor General as *amicus*, and the dissent to

adopt textual readings of the statute that attempt to mitigate these harms. Brief for United States 27–28; *post*, at 24–28. But those readings are not defensible, for they require too many unprecedented jumps over linguistic and other hurdles that in our view are insurmountable. See, *e.g.*, *post*, at 26 (acknowledging that its reading of §106(3) "significantly curtails the independent effect of §109(a)").

Finally, the fact that harm has proved limited so far may simply reflect the reluctance of copyright holders so far to assert geographically based resale rights. They may decide differently if the law is clarified in their favor. Regardless, a copyright law that can work in practice only if unenforced is not a sound copyright law. It is a law that would create uncertainty, would bring about selective enforcement, and, if widely unenforced, would breed disrespect for copyright law itself.

Thus, we believe that the practical problems that petitioner and his *amici* have described are too serious, too extensive, and too likely to come about for us to dismiss them as insignificant—particularly in light of the ever-growing importance of foreign trade to America. See The World Bank, Imports of goods and services (% of GDP) (imports in 2011 18% of U. S. gross domestic product compared to 11% in 1980), online at http:// data.worldbank.org/indicator/NE.IMP.GNFS.ZS? (as visited Mar. 15, 2013, and available in Clerk of Court's case file). The upshot is that copyright-related consequences along with language, context, and interpretive canons argue strongly against a geographical interpretation of §109(a).

## III

Wiley and the dissent make several additional important arguments in favor of the geographical interpretation. *First*, they say that our *Quality King* decision strongly supports its geographical interpretation. In that case

we asked whether the Act's "importation provision," now §602(a)(1) (then §602(a)), barred importation (without permission) of a copyrighted item (labels affixed to hair care products) where an American copyright owner authorized the first sale and export of hair care products with copyrighted labels made in the United States, and where a buyer sought to import them back into the United States without the copyright owner's permission. 523 U. S., at 138–139.

We held that the importation provision did *not* prohibit sending the products back into the United States (without the copyright owner's permission). That section says:

> "Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States *is an infringement* of the exclusive right to distribute copies or phono-records *under section 106*." 17 U. S. C. §602(a)(1) (2006 ed., Supp. V) (emphasis added). See also §602(a) (1994 ed.).

We pointed out that this section makes importation an infringement of the "exclusive right to distribute . . . *under 106*." We noted that §109(a)'s "first sale" doctrine limits the scope of the §106 exclusive distribution right. We took as given the fact that the products at issue had at least once been sold. And we held that consequently, importation of the copyrighted labels does not violate §602(a)(1). 523 U. S., at 145.

In reaching this conclusion we endorsed *Bobbs-Merrill* and its statement that the copyright laws were not "intended to create a right which would permit the holder of the copyright to fasten, by notice in a book . . . a restriction upon the subsequent alienation of the subject-matter of copyright after the owner had parted with the title to one who had acquired full dominion over it." 210 U. S., at

349–350.

We also explained why we rejected the claim that our interpretation would make §602(a)(1) pointless. Those advancing that claim had pointed out that the 1976 Copyright Act amendments retained a prior anti-piracy provision, prohibiting the importation of *pirated* copies. *Quality King, supra*, at 146. Thus, they said, §602(a)(1) must prohibit the importation of lawfully made copies, for to allow the importation of those lawfully made copies *after a first sale,* as *Quality King'*s holding would do, would leave §602(a)(1) without much to prohibit. It would become superfluous, without any real work to do.

We do not believe that this argument is a strong one. Under *Quality King'*s interpretation, §602(a)(1) would still forbid importing (without permission, and subject to the exceptions in §602(a)(3)) copies lawfully made abroad, for example, where (1) a foreign publisher operating as the licensee of an American publisher prints copies of a book overseas but, prior to any authorized sale, seeks to send them to the United States; (2) a foreign printer or other manufacturer (if not the "owner" for purposes of §109(a), *e.g.,* before an authorized sale) sought to send copyrighted goods to the United States; (3) "a book publisher transports copies to a wholesaler" and the wholesaler (not yet the owner) sends them to the United States, see Copyright Law Revision, pt. 4, at 211 (giving this example); or (4) a foreign film distributor, having leased films for distribution, or any other licensee, consignee, or bailee sought to send them to the United States. See, *e.g.,* 2 Nimmer on Copyright §8.12[B][1][a], at 8–159 ("Section 109(a) provides that the distribution right may be exercised solely with respect to the initial disposition of copies of a work, not to prevent or restrict the resale or other further transfer of possession of such copies"). These examples show that §602(a)(1) retains significance. We concede it has less significance than the dissent believes appropriate, but the

dissent also adopts a construction of §106(3) that "significantly curtails" §109(a)'s effect, *post*, at 26, and so limits the scope of that provision to a similar, or even greater, degree.

In *Quality King* we rejected the "superfluous" argument for similar reasons. But, when rejecting it, we said that, where an author gives exclusive American distribution rights to an American publisher and exclusive British distribution rights to a British publisher, "presumably *only those [copies] made by the publisher of the United States edition would be 'lawfully made under this title'* within the meaning of §109(a)." 523 U. S., at 148 (emphasis added). Wiley now argues that this phrase in the *Quality King* opinion means that books published abroad (under license) must fall outside the words "lawfully made under this title" and that we have consequently already given those words the geographical interpretation that it favors.

We cannot, however, give the *Quality King* statement the legal weight for which Wiley argues. The language "lawfully made under this title" was not at issue in *Quality King*; the point before us now was not then fully argued; we did not canvas the considerations we have here set forth; we there said nothing to suggest that the example assumes a "first sale"; and we there hedged our statement with the word "presumably." Most importantly, the statement is pure dictum. It is dictum contained in a rebuttal to a counterargument. And it is *unnecessary* dictum even in that respect. Is the Court having once written dicta calling a tomato a vegetable bound to deny that it is a fruit forever after?

To the contrary, we have written that we are not necessarily bound by dicta should more complete argument demonstrate that the dicta is not correct. *Central Va. Community College* v. *Katz*, 546 U. S. 356, 363 (2006) ("[W]e are not bound to follow our dicta in a prior case in

which the point now at issue was not fully debated");
*Humphrey's Executor* v. *United States*, 295 U. S. 602,
627–628 (1935) (rejecting, under *stare decisis*, dicta, "which
may be followed if sufficiently persuasive but which are
not controlling"). And, given the bit part that our *Quality
King* statement played in our *Quality King* decision, we
believe the view of *stare decisis* set forth in these opinions
applies to the matter now before us.

*Second*, Wiley and the dissent argue (to those who con-
sider legislative history) that the Act's legislative history
supports their interpretation. But the historical events to
which it points took place more than a decade before the
enactment of the Act and, at best, are inconclusive.

During the 1960's, representatives of book, record, and
film industries, meeting with the Register of Copyrights to
discuss copyright revision, complained about the difficulty
of dividing international markets. Copyright Law Revi-
sion Discussion and Comments on Report of the Register
of Copyrights on the General Revision of the U. S. Copy-
right Law, 88th Cong., 1st Sess., pt. 2, p. 212 (Comm.
Print 1963) (English editions of "particular" books "fin[d]"
their "way into this country"); *id.,* at 213 (works "pub-
li[shed] in a country where there is no copyright protection
of any sort" are put into "the free stream of commerce" and
"shipped to the United States"); *ibid.* (similar concern in
respect to films).

The then-Register of Copyrights, Abraham Kaminstein,
found these examples "very troubl[ing]." *Ibid.* And the
Copyright Office released a draft provision that it said
"deals with the matter of the importation for distribution
in the United States of foreign copies that were made
under proper authority but that, if sold in the United
States, would be sold in contravention of the rights of the
copyright owner who holds the exclusive right to sell
copies in the United States." *Id.*, pt. 4, at 203. That draft
version, without reference to §106, simply forbids unau-

thorized imports. It said:

> "Importation into the United States of copies or records of a work for the purpose of distribution to the public shall, if such articles are imported without the authority of the owner of the exclusive right to distribute copies or records under this title, constitute an infringement of copyright actionable under section 35 [17 U. S. C. §501]." *Id.*, Preliminary Draft for Revised U. S. Copyright Law and Discussions and Comments, 88th Cong., 2d Sess., pt. 3, pp. 32–33 (Comm. Print 1964).

In discussing the draft, some of those present expressed concern about its effect on the "first sale" doctrine. For example, Irwin Karp, representing the Authors League of America asked, "If a German jobber lawfully buys copies from a German publisher, are we not running into the problem of restricting his transfer of his lawfully obtained copies?" *Id.*, pt. 4, at 211. The Copyright Office representative replied, "This could vary from one situation to another, I guess. I should guess, for example, that if a book publisher transports [*i.e.,* does not sell] copies to a wholesaler [*i.e.,* a *nonowner*], this is not *yet* the kind of transaction that exhausts the right to control disposition." *Ibid.* (emphasis added).

The Office later withdrew the draft, replacing it with a draft, which, by explicitly referring to §106, was similar to the provision that became law, now §602(a)(1). The Office noted in a report that, under the new draft, importation of a copy (without permission) "would violate the exclusive rights of the U. S. copyright owner . . . where the copyright owner had authorized the making of copies in a foreign country for distribution only in that country." *Id.*, pt. 6, at 150.

Still, that part of the report says nothing about the "first sale" doctrine, about §109(a), or about the five words,

"lawfully made under this title." And neither the report nor its accompanying 1960's draft answers the question before us here. Cf. *Quality King*, 523 U. S., at 145 (without those five words, the import clause, via its reference to §106, imports the "first sale" doctrine).

But to ascertain the best reading of *§109(a)*, rather than dissecting the remarks of industry representatives concerning §602 at congressional meetings held 10 years before the statute was enacted, see *post,* at 13–16, we would give greater weight to the congressional report accompanying §109(a), written a decade later when Congress passed the new law. That report says:

> "Section 109(a) restates and confirms the principle that, where the *copyright* owner has transferred ownership of a particular copy or phonorecord of a work, the person to whom the copy or phonorecord is transferred is entitled to dispose of it by sale, rental, or any other means. Under this principle, which has been established by the court decisions and . . . the present law, the copyright owner's exclusive right of public distribution would have no effect upon anyone who owns 'a particular copy or phonorecord lawfully made under this title' and who wishes to transfer it to someone else or to destroy it.

> .     .     .     .     .

> "To come within the scope of section 109(a), a copy or phonorecord must have been 'lawfully made under this title,' though not necessarily with the copyright owner's authorization. For example, any resale of an illegally 'pirated' phonorecord would be an infringement but the disposition of a phonorecord legally made under the compulsory licensing provisions of section 115 would not." H. R. Rep. No. 94–1476, at 79 (emphasis added).

Accord, S. Rep. No. 94–473, pp. 71–72 (1975).

This history reiterates the importance of the "first sale" doctrine. See, *e.g.,* Copyright Law Revision, 1964 Revision Bill with Discussions and Comments, 89th Cong., 1st Sess., pt. 5, p. 66 (Comm. Print 1965) ("[F]ull ownership of a lawfully-made copy authorizes its owner to dispose of it freely"). It explains, as we have explained, the nongeographical purposes of the words "lawfully made under this title." Part II–B, *supra.* And it says nothing about geography. Nor, importantly, did §109(a)'s predecessor provision. See *supra,* at 12. This means that, contrary to the dissent's suggestion, any lack of legislative history pertaining to the "first sale" doctrine only tends to bolster our position that Congress' 1976 revision did not intend to create a drastic geographical change in its revision to that provision. See *post*, at 18, n. 13. We consequently believe that the legislative history, on balance, supports the nongeographical interpretation.

*Third*, Wiley and the dissent claim that a nongeographical interpretation will make it difficult, perhaps impossible, for publishers (and other copyright holders) to divide foreign and domestic markets. We concede that is so. A publisher may find it more difficult to charge different prices for the same book in different geographic markets. But we do not see how these facts help Wiley, for we can find no basic principle of copyright law that suggests that publishers are especially entitled to such rights.

The Constitution describes the nature of American copyright law by providing Congress with the power to "secur[e]" to "[a]uthors" "for limited [t]imes" the *exclusive [r]ight to their . . . [w]ritings.*" Art. I, §8, cl. 8. The Founders, too, discussed the need to grant an author a limited right to exclude competition. Compare Letter from Thomas Jefferson to James Madison (July 31, 1788), in 13 Papers of Thomas Jefferson 440, 442–443 (J. Boyd ed. 1956) (arguing against any monopoly) with Letter from James

Madison to Thomas Jefferson (Oct. 17, 1788), in 14 *id.,* at 16, 21 (J. Boyd ed. 1958) (arguing for a limited monopoly to secure production). But the Constitution's language nowhere suggests that its limited exclusive right should include a right to divide markets or a concomitant right to charge different purchasers different prices for the same book, say to increase or to maximize gain. Neither, to our knowledge, did any Founder make any such suggestion. We have found no precedent suggesting a legal preference for interpretations of copyright statutes that would provide for market divisions. Cf. Copyright Law Revision, pt. 2, at 194 (statement of Barbara Ringer, Copyright Office) (division of territorial markets was "primarily a matter of private contract").

To the contrary, Congress enacted a copyright law that (through the "first sale" doctrine) limits copyright holders' ability to divide domestic markets. And that limitation is consistent with antitrust laws that ordinarily forbid market divisions. Cf. *Palmer* v. *BRG of Ga., Inc.,* 498 U. S. 46, 49–50 (1990) (*per curiam*) ("[A]greements between competitors to allocate territories to minimize competition are illegal"). Whether copyright owners should, or should not, have more than ordinary commercial power to divide international markets is a matter for Congress to decide. We do no more here than try to determine what decision Congress has taken.

*Fourth*, the dissent and Wiley contend that our decision launches United States copyright law into an unprecedented regime of "international exhaustion." *Post*, at 18–23; Brief for Respondent 45–46. But they point to nothing indicative of congressional intent in 1976. The dissent also claims that it is clear that the United States now opposes adopting such a regime, but the Solicitor General as *amicus* has taken no such position in this case. In fact, when pressed at oral argument, the Solicitor General stated that the consequences of Wiley's reading of the

statute (perpetual downstream control) were "worse" than those of Kirtsaeng's reading (restriction of market segmentation). Tr. of Oral Arg. 51. And the dissent's reliance on the Solicitor General's position in *Quality King* is undermined by his agreement in that case with our reading of §109(a). Brief for United States as *Amicus Curiae* in *Quality King*, O. T. 1996, No. 1470, p. 30 ("When . . . Congress wishes to make the location of manufacture relevant to Copyright Act protection, it does so expressly"); *ibid.* (calling it "distinctly unlikely" that Congress would have provided an incentive for overseas manufacturing).

Moreover, the exhaustion regime the dissent apparently favors would provide that "the sale in one country of a good" does not "exhaus[t] the intellectual-property owner's right to control the distribution of that good elsewhere." *Post*, at 18–19. But our holding in *Quality King* that §109(a) is a defense in U. S. courts even when "the first sale occurred abroad," 523 U. S., at 145, n. 14, has already significantly eroded such a principle.

IV

For these reasons we conclude that the considerations supporting Kirtsaeng's nongeographical interpretation of the words "lawfully made under this title" are the more persuasive. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

—————

No. 11–697

—————

## SUPAP KIRTSAENG, DBA BLUECHRISTINE99, PETITIONER *v.* JOHN WILEY & SONS, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[March 19, 2013]

JUSTICE KAGAN, with whom JUSTICE ALITO joins, concurring.

I concur fully in the Court's opinion. Neither the text nor the history of 17 U. S. C. §109(a) supports removing first-sale protection from every copy of a protected work manufactured abroad. See *ante*, at 8–16, 28–31. I recognize, however, that the combination of today's decision and *Quality King Distributors, Inc.* v. *L'anza Research Int'l, Inc.*, 523 U. S. 135 (1998), constricts the scope of §602(a)(1)'s ban on unauthorized importation. I write to suggest that any problems associated with that limitation come not from our reading of §109(a) here, but from *Quality King*'s holding that §109(a) limits §602(a)(1).

As the Court explains, the first-sale doctrine has played an integral part in American copyright law for over a century. See *ante*, at 17–19; *Bobbs-Merrill Co.* v. *Straus*, 210 U. S. 339 (1908). No codification of the doctrine prior to 1976 even arguably limited its application to copies made in the United States. See *ante*, at 12. And nothing in the text or history of §109(a)—the Copyright Act of 1976's first-sale provision—suggests that Congress meant to enact the new, geographical restriction John Wiley proposes, which at once would deprive American consumers of important rights and encourage copyright holders to manufacture abroad. See *ante*, at 8–16, 28–31.

That said, John Wiley is right that the Court's decision, when combined with *Quality King*, substantially narrows §602(a)(1)'s ban on unauthorized importation. *Quality King* held that the importation ban does not reach any copies receiving first-sale protection under §109(a). See 523 U. S., at 151–152. So notwithstanding §602(a)(1), an "owner of a particular copy . . . lawfully made under this title" can import that copy without the copyright owner's permission. §109(a). In now holding that copies "lawfully made under this title" include copies manufactured abroad, we unavoidably diminish §602(a)(1)'s scope— indeed, limit it to a fairly esoteric set of applications. See *ante,* at 26–27.

But if Congress views the shrinking of §602(a)(1) as a problem, it should recognize *Quality King*—not our decision today—as the culprit. Here, after all, we merely construe §109(a); *Quality King* is the decision holding that §109(a) limits §602(a)(1). Had we come out the opposite way in that case, §602(a)(1) would allow a copyright owner to restrict the importation of copies irrespective of the first-sale doctrine.[1] That result would enable the copyright owner to divide international markets in the way John Wiley claims Congress intended when enacting §602(a)(1). But it would do so without imposing down-

—————

[1] Although *Quality King* concluded that the statute's text foreclosed that outcome, see 523 U. S., at 151–152, the Solicitor General offered a cogent argument to the contrary. He reasoned that §109(a) does not limit §602(a)(1) because the former authorizes owners only to "sell" or "dispose" of copies—not to import them: The Act's first-sale provision and its importation ban thus regulate separate, non-overlapping spheres of conduct. See Brief for United States as *Amicus Curiae* in *Quality King*, O. T. 1996, No. 96–1470, pp. 5, 8–10. That reading remains the Government's preferred way of construing the statute. See Tr. of Oral Arg. 44 ("[W]e think that we still would adhere to our view that section 109(a) should not be read as a limitation on section 602(a)(1)"); see also *ante,* at 32–33; *post,* at 21, n. 15 (GINSBURG, J., dissenting).

stream liability on those who purchase and resell in the United States copies that happen to have been manufactured abroad. In other words, that outcome would target unauthorized importers alone, and not the "libraries, used-book dealers, technology companies, consumer-goods retailers, and museums" with whom the Court today is rightly concerned. *Ante*, at 19. Assuming Congress adopted §602(a)(1) to permit market segmentation, I suspect that is how Congress thought the provision would work—not by removing first-sale protection from every copy manufactured abroad (as John Wiley urges us to do here), but by enabling the copyright holder to control imports even when the first-sale doctrine applies (as *Quality King* now prevents).[2]

At bottom, John Wiley (together with the dissent) asks us to misconstrue §109(a) in order to restore §602(a)(1) to its purportedly rightful function of enabling copyright holders to segment international markets. I think John Wiley may have a point about what §602(a)(1) was designed to do; that gives me pause about *Quality King*'s holding that the first-sale doctrine limits the importation ban's scope. But the Court today correctly declines the

————————

[2] Indeed, allowing the copyright owner to restrict imports irrespective of the first-sale doctrine—*i.e.*, reversing *Quality King*—would yield a far more sensible scheme of market segmentation than would adopting John Wiley's argument here. That is because only the former approach turns on the *intended market* for copies; the latter rests instead on their *place of manufacture*. To see the difference, imagine that John Wiley prints all its textbooks in New York, but wants to distribute certain versions only in Thailand. Without *Quality King*, John Wiley could do so—*i.e.,* produce books in New York, ship them to Thailand, and prevent anyone from importing them back into the United States. But with *Quality King*, that course is not open to John Wiley even under its reading of §109(a): To prevent someone like Kirtsaeng from reimporting the books—and so to segment the Thai market—John Wiley would have to move its printing facilities abroad. I can see no reason why Congress would have conditioned a copyright owner's power to divide markets on outsourcing its manufacturing to a foreign country.

invitation to save §602(a)(1) from *Quality King* by destroy-
ing the first-sale protection that §109(a) gives to every
owner of a copy manufactured abroad.  That would swap
one (possible) mistake for a much worse one, and make
our reading of the statute only less reflective of Congres-
sional intent.  If Congress thinks copyright owners need
greater power to restrict importation and thus divide
markets, a ready solution is at hand—not the one John
Wiley offers in this case, but the one the Court rejected in
*Quality King*.

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–697

_____

## SUPAP KIRTSAENG, DBA BLUECHRISTINE99, PETITIONER *v.* JOHN WILEY & SONS, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[March 19, 2013]

JUSTICE GINSBURG, with whom JUSTICE KENNEDY joins, and with whom JUSTICE SCALIA joins except as to Parts III and V–B–1, dissenting.

"In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress." *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 542 (1940). Instead of adhering to the Legislature's design, the Court today adopts an interpretation of the Copyright Act at odds with Congress' aim to protect copyright owners against the unauthorized importation of low-priced, foreign-made copies of their copyrighted works. The Court's bold departure from Congress' design is all the more stunning, for it places the United States at the vanguard of the movement for "international exhaustion" of copyrights—a movement the United States has steadfastly resisted on the world stage.

To justify a holding that shrinks to insignificance copyright protection against the unauthorized importation of foreign-made copies, the Court identifies several "practical problems." *Ante*, at 24. The Court's parade of horribles, however, is largely imaginary. Congress' objective in enacting 17 U. S. C. §602(a)(1)'s importation prohibition can be honored without generating the absurd consequences hypothesized in the Court's opinion. I dissent

from the Court's embrace of "international exhaustion," and would affirm the sound judgment of the Court of Appeals.

I

Because economic conditions and demand for particular goods vary across the globe, copyright owners have a financial incentive to charge different prices for copies of their works in different geographic regions. Their ability to engage in such price discrimination, however, is undermined if arbitrageurs are permitted to import copies from low-price regions and sell them in high-price regions. The question in this case is whether the unauthorized importation of foreign-made copies constitutes copyright infringement under U. S. law.

To answer this question, one must examine three provisions of Title 17 of the U. S. Code: §§106(3), 109(a), and 602(a)(1). Section 106 sets forth the "exclusive rights" of a copyright owner, including the right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." §106(3). This distribution right is limited by §109(a), which provides: "Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." Section 109(a) codifies the "first sale doctrine," a doctrine articulated in *Bobbs-Merrill Co.* v. *Straus*, 210 U. S. 339, 349–351 (1908), which held that a copyright owner could not control the price at which retailers sold lawfully purchased copies of its work. The first sale doctrine recognizes that a copyright owner should not be permitted to exercise perpetual control over the distribution of copies of a copyrighted work. At some point—ordinarily the time of the first commercial sale—

the copyright owner's exclusive right under §106(3) to control the distribution of a particular copy is exhausted, and from that point forward, the copy can be resold or otherwise redistributed without the copyright owner's authorization.

Section 602(a)(1) (2006 ed., Supp. V)[1]—last, but most critical, of the three copyright provisions bearing on this case—is an importation ban. It reads:

> "Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable under section 501."

In *Quality King Distributors, Inc.* v. *L'anza Research Int'l, Inc.*, 523 U. S. 135, 143–154 (1998), the Court held that a copyright owner's right to control importation under §602(a)(1) is a component of the distribution right set forth in §106(3) and is therefore subject to §109(a)'s codification of the first sale doctrine. *Quality King* thus held that the importation of copies *made in the United States* but sold abroad did not rank as copyright infringement under §602(a)(1). *Id.*, at 143–154. See also *id.*, at 154 (GINSBURG, J., concurring) (*Quality King* "involve[d] a 'round trip' journey, travel of the copies in question from the United States to places abroad, then back again").[2]

———————

[1] In 2008, Congress renumbered what was previously §602(a) as §602(a)(1). See Prioritizing Resources and Organization for Intellectual Property Act of 2008 (PROIPA), §105(b)(2), 122 Stat. 4259. Like the Court, I refer to the provision by its current numbering.

[2] Although JUSTICE KAGAN's concurrence suggests that *Quality King* erred in "holding that §109(a) limits §602(a)(1)," *ante*, at 2, that recent, unanimous holding must be taken as a given. See *John R. Sand & Gravel Co.* v. *United States*, 552 U. S. 130, 139 (2008) ("*[S]tare decisis* in respect to statutory interpretation has 'special force,' for 'Congress

Important to the Court's holding, the copies at issue in *Quality King* had been "'lawfully made under [Title 17]'"—a prerequisite for application of §109(a). *Id.*, at 143, n. 9 (quoting §109(a)). Section 602(a)(1), the Court noted, would apply to "copies that were 'lawfully made' not under the United States Copyright Act, but instead, under the law of some other country." *Id.*, at 147. Drawing on an example discussed during a 1964 public meeting on proposed revisions to the U. S. copyright laws,[3] the Court stated:

> "If the author of [a] work gave the exclusive United States distribution rights—enforceable under the Act—to the publisher of the United States edition and the exclusive British distribution rights to the publisher of the British edition, . . . presumably only those [copies] made by the publisher of the United States edition would be 'lawfully made under this title' within the meaning of §109(a). The first sale doctrine would not provide the publisher of the British edition who decided to sell in the American market with a defense to an action under §602(a) (or, for that matter,

_____

remains free to alter what we have done.'" (quoting *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989))). The Court's objective in this case should be to avoid unduly "constrict[ing] the scope of §602(a)(1)'s ban on unauthorized importation," *ante*, at 1 (opinion of KAGAN, J.), while at the same time remaining faithful to *Quality King*'s holding and to the text and history of other Copyright Act provisions. This aim is not difficult to achieve. See Parts II–V, *infra.* JUSTICE KAGAN and I appear to agree to this extent: Congress meant the ban on unauthorized importation to have real force. See *ante*, at 3 (acknowledging that "Wiley may have a point about what §602(a)(1) was designed to do").

[3] See *Quality King Distributors, Inc.* v. *L'anza Research Int'l, Inc.*, 523 U. S. 135, 148, n. 20 (1998) (quoting Copyright Law Revision Part 4: Further Discussions and Comments on Preliminary Draft for Revised U. S. Copyright Law, 88th Cong., 2d Sess., 119 (H. R. Judiciary Comm. Print 1964) (hereinafter Copyright Law Revision Part 4) (statement of Harriet Pilpel)).

to an action under §106(3), if there was a distribution of the copies)." *Id.*, at 148.

As the District Court and the Court of Appeals concluded, see 654 F. 3d 210, 221–222 (CA2 2011); App. to Pet. for Cert. 70a–73a, application of the *Quality King* analysis to the facts of this case would preclude any invocation of §109(a). Petitioner Supap Kirtsaeng imported and then sold at a profit over 600 copies of copyrighted textbooks printed outside the United States by the Asian subsidiary of respondent John Wiley & Sons, Inc. (Wiley). App. 29–34. See also *ante*, at 3–5 (opinion of the Court). In the words the Court used in *Quality King*, these copies "were 'lawfully made' not under the United States Copyright Act, but instead, under the law of some other country." 523 U. S., at 147. Section 109(a) therefore does not apply, and Kirtsaeng's unauthorized importation constitutes copyright infringement under §602(a)(1).

The Court does not deny that under the language I have quoted from *Quality King*, Wiley would prevail. *Ante*, at 27. Nevertheless, the Court dismisses this language, to which all Members of the *Quality King* Court subscribed, as ill-considered dictum. *Ante*, at 27–28. I agree that the discussion was dictum in the sense that it was not essential to the Court's judgment. See *Quality King*, 523 U. S., at 154 (GINSBURG, J., concurring) ("[W]e do not today resolve cases in which the allegedly infringing imports were manufactured abroad."). But I disagree with the Court's conclusion that this dictum was ill considered. Instead, for the reasons explained below, I would hold, consistently with *Quality King*'s dictum, that §602(a)(1) authorizes a copyright owner to bar the importation of a copy manufactured abroad for sale abroad.

## II

The text of the Copyright Act demonstrates that Congress intended to provide copyright owners with a potent

remedy against the importation of foreign-made copies of their copyrighted works. As the Court recognizes, *ante*, at 3, this case turns on the meaning of the phrase "lawfully made under this title" in §109(a). In my view, that phrase is most sensibly read as referring to instances in which a copy's creation is governed by, and conducted in compliance with, Title 17 of the U. S. Code. This reading is consistent with the Court's interpretation of similar language in other statutes. See *Florida Dept. of Revenue* v. *Piccadilly Cafeterias, Inc.*, 554 U. S. 33, 52–53 (2008) ("under" in 11 U. S. C. §1146(a), a Bankruptcy Code provision exempting certain asset transfers from stamp taxes, means "pursuant to"); *Ardestani* v. *INS*, 502 U. S. 129, 135 (1991) (the phrase "under section 554" in the Equal Access to Justice Act means "subject to" or "governed by" 5 U. S. C. §554 (internal quotation marks omitted)). It also accords with dictionary definitions of the word "under." See, *e.g.*, American Heritage Dictionary 1887 (5th ed. 2011) ("under" means, among other things, "[s]ubject to the authority, rule, or control of").

Section 109(a), properly read, affords Kirtsaeng no defense against Wiley's claim of copyright infringement. The Copyright Act, it has been observed time and again, does not apply extraterritorially. See *United Dictionary Co.* v. *G. & C. Merriam Co.*, 208 U. S. 260, 264 (1908) (copyright statute requiring that U. S. copyright notices be placed in all copies of a work did not apply to copies published abroad because U. S. copyright laws have no "force" beyond the United States' borders); 4 M. Nimmer & D. Nimmer, Copyright §17.02, p. 17–18 (2012) (hereinafter Nimmer) ("[C]opyright laws do not have any extraterritorial operation."); 4 W. Patry, Copyright §13:22, p. 13–66 (2012) (hereinafter Patry) ("Copyright laws are rigorously territorial."). The printing of Wiley's foreign-manufactured textbooks therefore was not governed by Title 17. The textbooks thus were not "lawfully made

under [Title 17]," the crucial precondition for application of §109(a). And if §109(a) does not apply, there is no dispute that Kirtsaeng's conduct constituted copyright infringement under §602(a)(1).

The Court's point of departure is similar to mine. According to the Court, the phrase "'lawfully made under this title' means made 'in accordance with' or 'in compliance with' the Copyright Act." *Ante*, at 8. But the Court overlooks that, according to the very dictionaries it cites, *ante*, at 9, the word "under" commonly signals a relationship of subjection, where one thing is governed or regulated by another. See Black's Law Dictionary 1525 (6th ed. 1990) ("under" "frequently" means "inferior" or "subordinate" (internal quotation marks omitted)); 18 Oxford English Dictionary 950 (2d ed. 1989) ("under" means, among other things, "[i]n accordance with (*some regulative power or principle*)" (emphasis added)). See also Webster's Third New International Dictionary 2487 (1961) ("under" means, among other things, "in . . . a condition of subjection, regulation, or subordination" and "suffering restriction, restraint, or control by"). Only by disregarding this established meaning of "under" can the Court arrive at the conclusion that Wiley's foreign-manufactured textbooks were "lawfully made under" U. S. copyright law, even though that law did not govern their creation. It is anomalous, however, to speak of particular conduct as "lawful" under an inapplicable law. For example, one might say that driving on the right side of the road in England is "lawful" under U. S. law, but that would be so only because U. S. law has nothing to say about the subject. The governing law is English law, and English law demands that driving be done on the left side of the road.[4]

_____

[4] The Court asserts that my position gives the word "lawfully" in §109(a) "little, if any, linguistic work to do." *Ante*, at 9. That is not so. My reading gives meaning to each word in the phrase "lawfully made

The logical implication of the Court's definition of the word "under" is that *any* copy manufactured abroad—even a piratical one made without the copyright owner's author- ization and in violation of the law of the country where it was created—would fall within the scope of §109(a). Any such copy would have been made "in accordance with" or "in compliance with" the U. S. Copyright Act, in the sense that manufacturing the copy did not violate the Act (be- cause the Act does not apply extraterritorially).

The Court rightly refuses to accept such an absurd conclusion. Instead, it interprets §109(a) as applying only to copies whose making actually complied with Title 17, or would have complied with Title 17 had Title 17 been ap- plicable (*i.e.*, had the copies been made in the United States). See *ante*, at 8 ("§109(a)'s 'first sale' doctrine would apply to copyrighted works as long as their manufacture met the requirements of American copyright law."). Con- gress, however, used express language when it called for such a counterfactual inquiry in 17 U. S. C. §§602(a)(2) and (b). See §602(a)(2) ("Importation into the United States or exportation from the United States, without the authority of the owner of copyright under this title, of copies or phonorecords, the making of which either consti- tuted an infringement of copyright, or *which would have constituted an infringement of copyright if this title had been applicable*, is an infringement of the exclusive right to distribute copies or phonorecords under section 106." (emphasis added)); §602(b) ("In a case where the making

_____

under this title." The word "made" signifies that the conduct at issue is the creation or manufacture of a copy. See Webster's Third New International Dictionary 1356 (1961) (defining "made" as "artificially produced by a manufacturing process"). The word "lawfully" indicates that for §109(a) to apply, the copy's creation must have complied with some body of law. Finally, the prepositional phrase "under this title" clarifies what that body of law is—namely, the copyright prescriptions contained in Title 17 of the U. S. Code.

of the copies or phonorecords *would have constituted an infringement of copyright if this title had been applicable*, their importation is prohibited." (emphasis added)).  Had Congress intended courts to engage in a similarly hypo- thetical inquiry under §109(a), Congress would pre- sumably have included similar language in that section. See *Russello* v. *United States*, 464 U. S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *United States* v. *Wong Kim Bo*, 472 F. 2d 720, 722 (CA5 1972) (*per curiam*); brackets in original)).[5]

———————

[5]Attempting to show that my reading of §109(a) is susceptible to the same criticism, the Court points to the now-repealed "manufacturing clause," which required "copies of a work consisting preponderantly of nondramatic literary material . . . in the English language" to be "manufactured in the United States or Canada."  Copyright Act of 1976, §601(a), 90 Stat. 2588.  Because Congress expressly referred to manu- facturing in this provision, the Court contends, the phrase "lawfully made under this title" in §109(a) cannot mean "manufactured in the United States."  *Ante*, at 19.  This argument is a non sequitur.  I do *not* contend that the phrases "lawfully made under this title" and "manu- factured in the United States" are interchangeable.  To repeat, I read the phrase "lawfully made under this title" as referring to instances in which a copy's creation is governed by, and conducted in compliance with, Title 17 of the U. S. Code.  See *supra*, at 6.  Not all copies "manu- factured in the United States" will satisfy this standard.  For example, piratical copies manufactured in the United States without the copy- right owner's authorization are not "lawfully made under [Title 17]." Nor would the phrase "lawfully manufactured in the United States" be an exact substitute for "lawfully made under this title."  The making of a copy may be lawful under Title 17 yet still violate some other provi- sion of law.  Consider, for example, a copy made with the copyright owner's authorization by workers who are paid less than minimum wage.  The copy would be "lawfully made under [Title 17]" in the sense that its creation would not violate any provision of that title, but the copy's manufacturing would nonetheless be unlawful due to the viola-

Not only does the Court adopt an unnatural construction of the §109(a) phrase "lawfully made under this title." Concomitantly, the Court reduces §602(a)(1) to insignificance. As the Court appears to acknowledge, see *ante*, at 26, the only independent effect §602(a)(1) has under today's decision is to prohibit unauthorized importations carried out by persons who merely have possession of, but do not own, the imported copies. See 17 U. S. C. §109(a) (§109(a) applies to any "*owner* of a particular copy or phonorecord lawfully made under this title" (emphasis added)).[6] If this is enough to avoid rendering §602(a)(1) entirely "superfluous," *ante*, at 26, it hardly suffices to give the owner's importation right the scope Congress intended it to have. Congress used broad language in §602(a)(1); it did so to achieve a broad objective. Had Congress intended simply to provide a copyright remedy against larcenous lessees, licensees, consignees, and bailees of films and other copyright-protected goods, see *ante*, at 13–14, 26, it likely would have used language tailored to that narrow purpose. See 2 Nimmer §8.12[B][6][c], at 8–184.31, n. 432 ("It may be wondered whether . . . potential causes of action [against licensees and the like] are more than theoretical."). See also *ante*, at 2 (KAGAN, J., concurring) (the Court's decision limits §602(a)(1) "to a fairly esoteric set of

———————————

tion of the minimum-wage laws.

[6] When §602(a)(1) was originally enacted in 1976, it played an additional role—providing a private cause of action against importers of piratical goods. See *Quality King*, 523 U. S., at 146. In 2008, however, Congress amended §602 to provide for such a cause of action in §602(a)(2), which prohibits the unauthorized "[i]mportation into the United States . . . of copies or phonorecords, the making of which either constituted an infringement of copyright, or which would have constituted an infringement of copyright if [Title 17] had been applicable." See PROIPA, §105(b)(3), 122 Stat. 4259–4260. Thus, under the Court's interpretation, the only conduct reached by §602(a)(1) but not §602(a)(2) is a nonowner's unauthorized importation of a nonpiratical copy.

applications").[7]

The Court's decision also overwhelms 17 U. S. C. §602(a)(3)'s exceptions to §602(a)(1)'s importation prohibition. 2 P. Goldstein, Copyright §7.6.1.2(a), p. 7:141 (3d ed. 2012) (hereinafter Goldstein).[8]  Those exceptions permit the importation of copies without the copyright owner's authorization for certain governmental, personal, scholarly, educational, and religious purposes.  17 U. S. C. §602(a)(3).  Copies imported under these exceptions "will often be lawfully made gray market goods purchased through normal market channels abroad."  2 Goldstein

———————

[7] Notably, the Court ignores the history of §602(a)(1), which reveals that the primary purpose of the prescription was not to provide a remedy against rogue licensees, consignees, and bailees, against whom copyright owners could frequently assert breach-of-contract claims even in the absence of §602(a)(1).  Instead, the primary purpose of §602(a)(1) was to reach third-party importers, enterprising actors like Kirtsaeng, against whom copyright owners could not assert contract claims due to lack of privity.  See Part III, *infra*.

[8] Section 602(a)(3) provides:

"This subsection [*i.e.*, §602(a)] does not apply to—

"(A) importation or exportation of copies or phonorecords under the authority or for the use of the Government of the United States or of any State or political subdivision of a State, but not including copies or phonorecords for use in schools, or copies of any audiovisual work imported for purposes other than archival use;

"(B) importation or exportation, for the private use of the importer or exporter and not for distribution, by any person with respect to no more than one copy or phonorecord of any one work at any one time, or by any person arriving from outside the United States or departing from the United States with respect to copies or phonorecords forming part of such person's personal baggage; or

"(C) importation by or for an organization operated for scholarly, educational, or religious purposes and not for private gain, with respect to no more than one copy of an audiovisual work solely for its archival purposes, and no more than five copies or phonorecords of any other work for its library lending or archival purposes, unless the importation of such copies or phonorecords is part of an activity consisting of systematic reproduction or distribution, engaged in by such organization in violation of the provisions of section 108(g)(2)."

§7.6.1.2(a), at 7:141.[9]   But if, as the Court holds, such copies can in any event be imported by virtue of §109(a), §602(a)(3)'s work has already been done.  For example, had Congress conceived of §109(a)'s sweep as the Court does, what earthly reason would there be to provide, as Congress did in §602(a)(3)(C), that a library may import "no more than five copies" of a non-audiovisual work for its "lending or archival purposes"?

The far more plausible reading of §§109(a) and 602(a), then, is that Congress intended §109(a) to apply to copies made in the United States, not to copies manufactured and sold abroad.  That reading of the first sale and importation provisions leaves §602(a)(3)'s exceptions with real, meaningful work to do.  See *TRW Inc.* v. *Andrews*, 534 U. S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)).  In the range of circumstances covered by the exceptions, §602(a)(3) frees individuals and entities who purchase foreign-made copies abroad from the requirement they would otherwise face under §602(a)(1) of obtaining the copyright owner's permission to import the copies into the United States.[10]

---

[9] The term "gray market good" refers to a good that is "imported outside the distribution channels that have been contractually negotiated by the intellectual property owner."  Forsyth & Rothnie, Parallel Imports, in The Interface Between Intellectual Property Rights and Competition Policy 429 (S. Anderman ed. 2007).  Such goods are also commonly called "parallel imports."  *Ibid.*

[10] The Court asserts that its reading of §109(a) is bolstered by §104, which extends the copyright "protection[s]" of Title 17 to a wide variety of foreign works.  See *ante*, at 10–11.  The "protection under this title" afforded by §104, however, is merely protection against infringing conduct within the United States, the only place where Title 17 applies.  See 4 W. Patry, Copyright §13:44.10, pp. 13–128 to 13–129 (2012) (hereinafter Patry).  Thus, my reading of the phrase "under this title" in

### III

The history of §602(a)(1) reinforces the conclusion I draw from the text of the relevant provisions: §109(a) does not apply to copies manufactured abroad. Section 602(a)(1) was enacted as part of the Copyright Act of 1976, 90 Stat. 2589–2590. That Act was the product of a lengthy revision effort overseen by the U. S. Copyright Office. See *Mills Music, Inc.* v. *Snyder*, 469 U. S. 153, 159–160 (1985). In its initial 1961 report on recommended revisions, the Copyright Office noted that publishers had "suggested that the [then-existing] import ban on piratical copies should be extended to bar the importation of . . . foreign edition[s]" in violation of "agreements to divide international markets for copyrighted works." Copyright Law Revision: Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 87th Cong., 1st Sess., 126 (H. R. Judiciary Comm. Print 1961) (hereinafter Copyright Law Revision). See Copyright Act of 1947, §106, 61 Stat. 663 ("The importation into the United States . . . of any piratical copies of any work copyrighted

---

§109(a) is consistent with Congress' use of that phrase in §104. Furthermore, §104 describes which *works* are entitled to copyright protection under U. S. law. But no one disputes that Wiley's copyrights in the works at issue in this case are valid. The only question is whether Kirtsaeng's importation of *copies* of those works infringed Wiley's copyrights. It is basic to copyright law that "[o]wnership of a copyright . . . is distinct from ownership of any material object in which the work is embodied." 17 U. S. C. §202. See also §101 ("'Copies' are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."). Given the distinction copyright law draws between works and copies, §104 is inapposite to the question here presented. 4 Patry §13:44.10, at 13–129 ("There is no connection, linguistically or substantively, between Section[s] 104 and 109: Section 104 deals with national eligibility for the *intangible* work of authorship; Section 109(a) deals with the *tangible*, physical embodiment of the work, the 'copy.'").

in the United States . . . is prohibited."). The Copyright Office originally recommended against such an extension of the importation ban, reasoning that enforcement of territorial restrictions was best left to contract law. Copyright Law Revision 126.

Publishing-industry representatives argued strenuously against the position initially taken by the Copyright Office. At a 1962 panel discussion on the Copyright Office's report, for example, Horace Manges of the American Book Publishers Council stated:

> "When a U. S. book publisher enters into a contract with a British publisher to acquire exclusive U. S. rights for a particular book, he often finds that the English edition . . . of that particular book finds its way into this country. Now it's all right to say, 'Commence a lawsuit for breach of contract.' But this is expensive, burdensome, and, for the most part, ineffective." Copyright Law Revision Part 2: Discussion and Comments on Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 88th Cong., 1st Sess., 212 (H. R. Judiciary Comm. Print 1963).

Sidney Diamond, representing London Records, elaborated on Manges' statement. "There are many situations," he explained, "in which it is not necessarily a question of the inadequacy of a contract remedy—in the sense that it may be difficult or not quick enough to solve the particular problem." *Id.*, at 213. "Very frequently," Diamond stated, publishers "run into a situation where . . . copies of [a] work . . . produced in a foreign country . . . may be shipped [to the United States] without violating any contract of the U. S. copyright proprietor." *Ibid.* To illustrate, Diamond noted, if a "British publisher [sells a copy] to an individual who in turn ship[s] it over" to the United States, the individual's conduct would not "violate [any] contract between

the British and the American publisher." *Ibid.* In such a case, "no possibility of any contract remedy" would exist. *Ibid.* The facts of Kirtsaeng's case fit Diamond's example, save that the copies at issue here were printed and initially sold in Asia rather than Great Britain.

After considering comments on its 1961 report, the Copyright Office "prepared a preliminary draft of provisions for a new copyright statute." Copyright Law Revision Part 3: Preliminary Draft for Revised U. S. Copyright Law and Discussions and Comments on the Draft, 88th Cong., 2d Sess., V (H. R. Judiciary Comm. Print 1964). Section 44 of the draft statute addressed the concerns raised by publishing-industry representatives. In particular, §44(a) provided:

> "Importation into the United States of copies or records of a work for the purpose of distribution to the public shall, if such articles are imported without the authority of the owner of the exclusive right to distribute copies or records under this title, constitute an infringement of copyright actionable under section 35 [*i.e.*, the section providing for a private cause of action for copyright infringement]." *Id.*, at 32–33.

In a 1964 panel discussion regarding the draft statute, Abe Goldman, the Copyright Office's General Counsel, left no doubt about the meaning of §44(a). It represented, he explained, a "shif[t]" from the Copyright Office's 1961 report, which had recommended against using copyright law to facilitate publishers' efforts to segment international markets. Copyright Law Revision Part 4: Further Discussions and Comments on Preliminary Draft for Revised U. S. Copyright Law, 88th Cong., 2d Sess., 203 (H. R. Judiciary Comm. Print 1964). Section 44(a), Goldman stated, would allow copyright owners to bring infringement actions against importers of "foreign copies that were made under proper authority." *Ibid.* See also

*id.*, at 205–206 (Goldman agreed with a speaker's comment that §44(a) "enlarge[d]" U. S. copyright law by extending import prohibitions "to works legally produced in Europe" and other foreign countries).[11]

The next step in the copyright revision process was the introduction in Congress of a draft bill on July 20, 1964. See Copyright Law Revision Part 5: 1964 Revision Bill with Discussions and Comments, 89th Cong., 1st Sess., III (H. R. Judiciary Comm. Print 1965). After another round of public comments, a revised bill was introduced on February 4, 1965. See Copyright Law Revision Part 6: Supplementary Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., V (H. R. Judiciary Comm. Print 1965) (hereinafter Copyright Law Revision Part 6). In language closely resembling the statutory text later enacted by Congress, §602(a) of the 1965 bill provided:

> "Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work for the purpose of distribution to the public is an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable under section 501." *Id.*, at 292.[12]

––––––––––––

[11] As the Court observes, *ante*, at 29, Irwin Karp of the Authors League of America stated at the 1964 panel discussion that §44(a) ran counter to "the very basic concept of copyright law that, once you've sold a copy legally, you can't restrict its resale." Copyright Law Revision Part 4, at 212. When asked if he was "presenting . . . an argument against" §44(a), however, Karp responded that he was "neutral on th[e] provision." *Id.*, at 211. There is thus little reason to believe that any changes to the wording of §44(a) before its codification in §602(a) were made in response to Karp's discussion of "the problem of restricting [the] transfer of . . . lawfully obtained [foreign] copies." *Ibid.*

[12] There is but one difference between this language from the 1965 bill and the corresponding language in the current version of §602(a)(1):

GINSBURG, J., dissenting

The Court implies that the 1965 bill's "explici[t] refer[ence] to §106" showed a marked departure from §44(a) of the Copyright Office's prior draft. *Ante*, at 29. The Copyright Office, however, did not see it that way. In its summary of the 1965 bill's provisions, the Copyright Office observed that §602(a) of the 1965 bill, like §44(a) of the Copyright Office's prior draft, see *supra*, at 15–16, permitted copyright owners to bring infringement actions against unauthorized importers in cases "where the copyright owner had authorized the making of [the imported] copies in a foreign country for distribution only in that country." Copyright Law Revision Part 6, at 149–150. See also *id.*, at XXVI (Under §602(a) of the 1965 bill, "[a]n unauthorized importer could be enjoined and sued for damages both where the copies or phonorecords he was importing were 'piratical' (that is, where their making would have constituted an infringement if the U. S. copyright law could have been applied), and where their making was 'lawful.'").

The current text of §602(a)(1) was finally enacted into law in 1976. See Copyright Act of 1976, §602(a), 90 Stat. 2589–2590. The House and Senate Committee Reports on the 1976 Act demonstrate that Congress understood, as did the Copyright Office, just what that text meant. Both Reports state:

> "Section 602 [deals] with two separate situations: importation of 'piratical' articles (that is, copies or phonorecords made without any authorization of the

---

In the current version, the phrase "for the purpose of distribution to the public" is omitted and the phrase "that have been acquired outside the United States" appears in its stead. There are no material differences between the quoted language from the 1965 bill and the corresponding language contained in the 1964 bill. See Copyright Law Revision Part 6: Supplementary Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., 292–293 (H. R. Judiciary Comm. Print 1965).

copyright owner), and unauthorized importation of copies or phonorecords that were lawfully made. *The general approach of section 602 is to make unauthorized importation an act of infringement in both cases*, but to permit the Bureau of Customs to prohibit importation only of 'piratical' articles." S. Rep. No. 94–473, p. 151 (1975) (emphasis added). See also H. R. Rep. No. 94–1476, p. 169 (1976) (same).

In sum, the legislative history of the Copyright Act of 1976 is hardly "inconclusive." *Ante*, at 28. To the contrary, it confirms what the plain text of the Act conveys: Congress intended §602(a)(1) to provide copyright owners with a remedy against the unauthorized importation of foreign-made copies of their works, even if those copies were made and sold abroad with the copyright owner's authorization.[13]

### IV

Unlike the Court's holding, my position is consistent with the stance the United States has taken in international-trade negotiations. This case bears on the highly contentious trade issue of interterritorial exhaustion. The issue arises because intellectual property law is territorial in nature, see *supra*, at 6, which means that creators of intellectual property "may hold a set of parallel" intellectual property rights under the laws of different nations. Chiappetta, The Desirability of Agreeing to Disagree: The WTO, TRIPS, International IPR Exhaustion and a Few Other Things, 21 Mich. J. Int'l L. 333, 340–341 (2000) (hereinafter Chiappetta). There is no international con-

---

[13] The Court purports to find support for its position in the House and Senate Committee Reports on the 1976 Copyright Act. *Ante*, at 30–31. It fails to come up with anything in the Act's legislative history, however, showing that Congress understood the words "lawfully made under this title" in §109(a) to encompass foreign-made copies.

sensus on whether the sale in one country of a good in-
corporating protected intellectual property exhausts the
intellectual property owner's right to control the distribu-
tion of that good elsewhere. Indeed, the members of the
World Trade Organization, "agreeing to disagree,"[14] pro-
vided in Article 6 of the Agreement on Trade-Related
Aspects of Intellectual Property Rights (TRIPS), Apr. 15,
1994, 33 I. L. M. 1197, 1200, that "nothing in this Agree-
ment shall be used to address the issue of . . . exhaustion."
See Chiappetta 346 (observing that exhaustion of intellec-
tual property rights was "hotly debated" during the TRIPS
negotiations and that Article 6 "reflects [the negotiators']
ultimate inability to agree" on a single international
standard). Similar language appears in other treaties to
which the United States is a party. See World Intellectual
Property Organization (WIPO) Copyright Treaty, Art. 6(2),
Dec. 20, 1996, S. Treaty Doc. No. 105–17, p. 7 ("Nothing in
this Treaty shall affect the freedom of Contracting Parties
to determine the conditions, if any, under which the ex-
haustion of the right [to control distribution of copies of a
copyrighted work] applies after the first sale or other
transfer of ownership of the original or a copy of the work
with the authorization of the author."); WIPO Perfor-
mances and Phonograms Treaty, Art. 8(2), Dec. 20, 1996,
S. Treaty Doc. No. 105–17, p. 28 (containing language
nearly identical to Article 6(2) of the WIPO Copyright
Treaty).

In the absence of agreement at the international level,
each country has been left to choose for itself the exhaus-
tion framework it will follow. One option is a national-
exhaustion regime, under which a copyright owner's right

---

[14]Chiappetta, The Desirability of Agreeing to Disagree: The WTO,
TRIPS, International IPR Exhaustion and a Few Other Things, 21
Mich. J. Int'l L. 333, 340 (2000) (hereinafter Chiappetta) (internal
quotation marks omitted).

to control distribution of a particular copy is exhausted only within the country in which the copy is sold. See Forsyth & Rothnie, Parallel Imports, in The Interface Between Intellectual Property Rights and Competition Policy 429, 430 (S. Anderman ed. 2007) (hereinafter Forsyth & Rothnie). Another option is a rule of international exhaustion, under which the authorized distribution of a particular copy anywhere in the world exhausts the copyright owner's distribution right everywhere with respect to that copy. See *ibid.* The European Union has adopted the intermediate approach of regional exhaustion, under which the sale of a copy anywhere within the European Economic Area exhausts the copyright owner's distribution right throughout that region. See *id.*, at 430, 445. Section 602(a)(1), in my view, ties the United States to a national-exhaustion framework. The Court's decision, in contrast, places the United States solidly in the international-exhaustion camp.

Strong arguments have been made both in favor of, and in opposition to, international exhaustion. See Chiappetta 360 ("[r]easonable people making valid points can, and do, reach conflicting conclusions" regarding the desirability of international exhaustion). International exhaustion subjects copyright-protected goods to competition from lower priced imports and, to that extent, benefits consumers. Correspondingly, copyright owners profit from a national-exhaustion regime, which also enlarges the monetary incentive to create new copyrightable works. See Forsyth & Rothnie 432–437 (surveying arguments for and against international exhaustion).

Weighing the competing policy concerns, our Government reached the conclusion that widespread adoption of the international-exhaustion framework would be inconsistent with the long-term economic interests of the United States. See Brief for United States as *Amicus Curiae* in *Quality King*, O. T. 1997, No. 96–1470, pp. 22–26 (herein-

after *Quality King* Brief).[15]  Accordingly, the United States
has steadfastly "taken the position in international trade
negotiations that domestic copyright owners should . . .
have the right to prevent the unauthorized importation of
copies of their work sold abroad."  *Id.*, at 22.  The United
States has "advanced this position in multilateral trade
negotiations," including the negotiations on the TRIPS
Agreement.  *Id.*, at 24.  See also D. Gervais, The TRIPS
Agreement: Drafting History and Analysis §2.63, p. 199
(3d ed. 2008).  It has also taken a dim view of our trading
partners' adoption of legislation incorporating elements
of international exhaustion.  See Clapperton & Corones,
Locking in Customers, Locking Out Competitors: Anti-
Circumvention Laws in Australia and Their Potential
Effect on Competition in High Technology Markets, 30
Melbourne U. L. Rev. 657, 664 (2006) (United States
expressed concern regarding international-exhaustion leg-
islation in Australia); Montén, Comment, The Inconsistency
Between Section 301 and TRIPS: Counterproductive
With Respect to the Future of International Protection
of Intellectual Property Rights? 9 Marq. Intellectual

_____

[15] The Court states that my "reliance on the Solicitor General's posi-
tion in *Quality King* is undermined by his agreement in that case with
[the] reading of §109(a)" that the Court today adopts.  *Ante,* at 33.  The
United States' principal concern in both *Quality King* and this case,
however, has been to protect copyright owners' "right to prevent paral-
lel imports."  Brief for United States as *Amicus Curiae* in *Quality King*,
O. T. 1997, No. 96–1470, p. 6 (hereinafter *Quality King* Brief).  See also
Brief for United States as *Amicus Curiae* 14 (arguing that Kirtsaeng's
interpretation of §109(a), which the Court adopts, would "subver[t]
Section 602(a)(1)'s ban on unauthorized importation").  In *Quality King*,
the Solicitor General urged this Court to hold that §109(a)'s codification
of the first sale doctrine does not limit the right to control importation
set forth in §602(a).  *Quality King* Brief 7–30.  After *Quality King*
rejected that contention, the United States reconsidered its position,
and it now endorses the interpretation of the §109(a) phrase "lawfully
made under this title" I would adopt.  Brief for United States as *Amicus
Curiae* 6–7, 13–14.

Property L. Rev. 387, 417–418 (2005) (same with respect to New Zealand and Taiwan).

Even if the text and history of the Copyright Act were ambiguous on the answer to the question this case presents—which they are not, see Parts II–III, *supra*[16]—I would resist a holding out of accord with the firm position the United States has taken on exhaustion in international negotiations. *Quality King*, I acknowledge, discounted the Government's concerns about potential inconsistency with United States obligations under certain bilateral trade agreements. See 523 U. S., at 153–154. See also *Quality King* Brief 22–24 (listing the agreements). That decision, however, dealt only with copyright-protected products made in the United States. See 523 U. S., at 154 (GINSBURG, J., concurring). *Quality King* left open the question whether owners of U. S. copyrights could retain control over the importation of copies manufactured and sold abroad—a point the Court obscures, see *ante,* at 33 (arguing that *Quality King* "significantly eroded" the national-exhaustion principle that, in my view, §602(a)(1) embraces). The Court today answers that question with a resounding "no," and in doing so, it risks undermining the United States' credibility on the world stage. While the Government has urged our trading partners to refrain from adopting international-exhaustion regimes that could benefit consumers within their borders but would impact adversely on intellectual-property producers in the United States, the Court embraces an international-exhaustion rule that could benefit U. S. consumers but would likely

---

[16] Congress hardly lacks capacity to provide for international exhaustion when that is its intent. Indeed, Congress has expressly provided for international exhaustion in the narrow context of semiconductor chips embodying protected "mask works." See 17 U. S. C. §§905(2), 906(b). See also 2 M. Nimmer & D. Nimmer, Copyright §8A.06[E], p. 8A–37 (2012) (hereinafter Nimmer) ("[T]he first sale doctrine under [§906(b)] expressly immunizes unauthorized importation.").

disadvantage foreign holders of U. S. copyrights. This dissonance scarcely enhances the United States' "role as a trusted partner in multilateral endeavors." *Vimar Seguros y Reaseguros, S. A.* v. *M/V Sky Reefer*, 515 U. S. 528, 539 (1995).

## V

I turn now to the Court's justifications for a decision difficult to reconcile with the Copyright Act's text and history.

## A

The Court asserts that its holding "is consistent with antitrust laws that ordinarily forbid market divisions." *Ante*, at 32. See also *ante*, at 18 (again referring to antitrust principles). Section 602(a)(1), however, read as I do and as the Government does, simply facilitates copyright owners' efforts to impose "vertical restraints" on distributors of copies of their works. See Forsyth & Rothnie 435 ("Parallel importation restrictions enable manufacturers and distributors to erect 'vertical restraints' in the market through exclusive distribution agreements."). See generally *Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U. S. 877 (2007) (discussing vertical restraints). We have held that vertical restraints are not *per se* illegal under §1 of the Sherman Act, 15 U. S. C. §1, because such "restraints can have procompetitive effects." 551 U. S., at 881–882.[17]

---

[17] Despite the Court's suggestion to the contrary, this case in no way implicates the *per se* antitrust prohibition against *horizontal* "'[a]greements between competitors to allocate territories to minimize competition.'" *Ante*, at 32 (quoting *Palmer* v. *BRG of Ga., Inc.*, 498 U. S. 46, 49 (1990) (*per curiam*)). Wiley is not requesting authority to enter into collusive agreements with other textbook publishers that would, for example, make Wiley the exclusive supplier of textbooks on particular subjects within particular geographic regions. Instead, Wiley asserts no more than the prerogative to impose *vertical* restraints

B

The Court sees many "horribles" following from a holding that the §109(a) phrase "lawfully made under this title" does not encompass foreign-made copies. *Ante*, at 22 (internal quotation marks omitted). If §109(a) excluded foreign-made copies, the Court fears, then copyright owners could exercise perpetual control over the downstream distribution or public display of such copies. A ruling in Wiley's favor, the Court asserts, would shutter libraries, put used-book dealers out of business, cripple art museums, and prevent the resale of a wide range of consumer goods, from cars to calculators. *Ante*, at 19–22. See also *ante*, at 2–3 (KAGAN, J., concurring) (expressing concern about "imposing downstream liability on those who purchase and resell in the United States copies that happen to have been manufactured abroad"). Copyright law and precedent, however, erect barriers to the anticipated horribles.[18]

1

Recognizing that foreign-made copies fall outside the ambit of §109(a) would not mean they are forever free of the first sale doctrine. As earlier observed, see *supra*, at 2, the Court stated that doctrine initially in its 1908 *Bobbs-*

_____

on the distribution of its own textbooks. See Hovenkamp, Post-Sale Restraints and Competitive Harm: The First Sale Doctrine in Perspective, 66 N. Y. U. Ann. Survey Am. L. 487, 488 (2011) ("vertical restraints" include "limits [on] the way a seller's own product can be distributed").

[18] As the Court observes, *ante,* at 32–33, the United States stated at oral argument that the types of "horribles" predicted in the Court's opinion would, if they came to pass, be "worse than the frustration of market segmentation" that will result from the Court's interpretation of §109(a). Tr. of Oral Arg. 51. The United States, however, recognized that this purported dilemma is a false one. As the United States explained, the Court's horribles can be avoided while still giving meaningful effect to §602(a)(1)'s ban on unauthorized importation. *Ibid.*

*Merrill* decision. At that time, no statutory provision expressly codified the first sale doctrine. Instead, copyright law merely provided that copyright owners had "the sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing, and vending" their works. Copyright Act of 1891, §1, 26 Stat. 1107.

In *Bobbs-Merrill*, the Court addressed the scope of the statutory right to "ven[d]." In granting that right, the Court held, Congress did not intend to permit copyright owners "to fasten . . . a restriction upon the subsequent alienation of the subject-matter of copyright after the owner had parted with the title to one who had acquired full dominion over it and had given a satisfactory price for it." 210 U. S., at 349–350. "[O]ne who has sold a copyrighted article . . . without restriction," the Court explained, "has parted with all right to control the sale of it." *Id.*, at 350. Thus, "[t]he purchaser of a book, once sold by authority of the owner of the copyright, may sell it again, although he could not publish a new edition of it." *Ibid.*

Under the logic of *Bobbs-Merrill*, the sale of a foreign-manufactured copy in the United States carried out with the copyright owner's authorization would exhaust the copyright owner's right to "vend" that copy. The copy could thenceforth be resold, lent out, or otherwise redistributed without further authorization from the copyright owner. Although §106(3) uses the word "distribute" rather than "vend," there is no reason to think Congress intended the word "distribute" to bear a meaning different from the construction the Court gave to the word "vend" in *Bobbs-Merrill*. See *ibid.* (emphasizing that the question before the Court was "purely [one] of statutory construction").[19]

--------

[19] It appears that the Copyright Act of 1976 omitted the word "vend" and introduced the word "distribute" to avoid the "redundan[cy]" present in pre-1976 law. Copyright Law Revision: Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 87th Cong., 1st Sess., 21 (H. R. Judiciary Comm. Print 1961) (noting

Thus, in accord with *Bobbs-Merrill*, the first authorized distribution of a foreign-made copy in the United States exhausts the copyright owner's distribution right under §106(3). After such an authorized distribution, a library may lend, or a used-book dealer may resell, the foreign-made copy without seeking the copyright owner's permission. Cf. *ante*, at 19–21.

For example, if Wiley, rather than Kirtsaeng, had imported into the United States and then sold the foreign-made textbooks at issue in this case, Wiley's §106(3) distribution right would have been exhausted under the rationale of *Bobbs-Merrill*. Purchasers of the textbooks would thus be free to dispose of the books as they wished without first gaining a license from Wiley.

This line of reasoning, it must be acknowledged, significantly curtails the independent effect of §109(a). If, as I maintain, the term "distribute" in §106(3) incorporates the first sale doctrine by virtue of *Bobbs-Merrill*, then §109(a)'s codification of that doctrine adds little to the regulatory regime.[20] Section 109(a), however, does serve

––––––––

that the exclusive rights to "publish" and "vend" works under the Copyright Act of 1947, §1(a), 61 Stat. 652–653, were "redundant").

[20] My position that *Bobbs-Merrill* lives on as a limiting construction of the §106(3) distribution right does not leave §109(a) with no work to do. There can be little doubt that the books at issue in *Bobbs-Merrill* were published and first sold in the United States. See *Bobbs-Merrill Co.* v. *Straus*, 139 F. 155, 157 (CC SDNY 1905) (the publisher claiming copyright infringement in *Bobbs-Merrill* was incorporated and had its principal office in Indiana). See also Copyright Act of 1891, §3, 26 Stat. 1107–1108 (generally prohibiting importation, even by the copyright owner, of foreign-manufactured copies of copyrighted books); 4 Patry §13:40, at 13–111 (under the Copyright Act of 1891, "copies of books by both foreign *and* U. S. authors had to be printed in the United States"). But cf. *ante*, at 18 (asserting, without acknowledging the 1891 Copyright Act's general prohibition against the importation of foreign-made copies of copyrighted books, that the Court is unable to find any "geographical distinctions . . . in *Bobbs-Merrill*"). Thus, exhaustion occurs under *Bobbs-Merrill* only when a copy is distributed within the United

as a statutory bulwark against courts deviating from *Bobbs-Merrill* in a way that increases copyright owners' control over downstream distribution, and legislative history indicates that is precisely the role Congress intended §109(a) to play. Congress first codified the first sale doctrine in §41 of the Copyright Act of 1909, 35 Stat. 1084.[21] It did so, the House Committee Report on the 1909 Act explains, "in order to make . . . clear that [Congress had] no intention [of] enlarg[ing] in any way the construction to be given to the word 'vend.'" H. R. Rep. No. 2222, 60th Cong., 2d Sess., 19 (1909). According to the Committee Report, §41 was "not intended to change [existing law] in any way." *Ibid.* The position I have stated and explained accords with this expression of congressional intent. In enacting §41 and its successors, I would hold, Congress did not "change . . . existing law," *ibid.*, by stripping the word "vend" (and thus its substitute "distribute") of the limiting construction imposed in *Bobbs-Merrill.*

In any event, the reading of the Copyright Act to which I subscribe honors Congress' aim in enacting §109(a) while the Court's reading of the Act severely diminishes §602(a)(1)'s role. See *supra*, at 10–12. My position in no way tugs against the principle underlying §109(a)—*i.e.*, that certain conduct by the copyright owner exhausts the

States with the copyright owner's permission, not when it is distributed abroad. But under §109(a), as interpreted in *Quality King*, any authorized distribution of a U. S.-made copy, even a distribution occurring in a foreign country, exhausts the copyright owner's distribution right under §106(3). See 523 U. S., at 145, n. 14. Section 109(a) therefore provides for exhaustion in a circumstance not reached by *Bobbs-Merrill.*

[21] Section 41 of the 1909 Act provided: "[N]othing in this Act shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained." 35 Stat. 1084. This language was repeated without material change in §27 of the Copyright Act of 1947, 61 Stat. 660. As noted above, see *supra*, at 2, 17 U. S. C. §109(a) sets out the current codification of the first sale doctrine.

owner's §106(3) distribution right. The Court, in contrast, fails to give meaningful effect to Congress' manifest intent in §602(a)(1) to grant copyright owners the right to control the importation of foreign-made copies of their works.

2

Other statutory prescriptions provide further protection against the absurd consequences imagined by the Court. For example, §602(a)(3)(C) permits "an organization operated for scholarly, educational, or religious purposes" to import, without the copyright owner's authorization, up to five foreign-made copies of a non-audiovisual work—notably, a book—for "library lending or archival purposes." But cf. *ante*, at 19–20 (suggesting that affirming the Second Circuit's decision might prevent libraries from lending foreign-made books).[22]

The Court also notes that *amici* representing art museums fear that a ruling in Wiley's favor would prevent museums from displaying works of art created abroad. *Ante*, at 22 (citing Brief for Association of Art Museum Directors et al.). These *amici* observe that a museum's right to display works of art often depends on 17 U. S. C. §109(c). See Brief for Association of Art Museum Directors et al. 11–13.[23] That provision addresses exhaustion of

—————

[22]A group of *amici* representing libraries expresses the concern that lower courts might interpret §602(a)(3)(C) as authorizing only the importing, but not the lending, of foreign-made copies of non-audiovisual works. See Brief for American Library Association et al. 20. The United States maintains, and I agree, however, that §602(a)(3)(C) "is fairly (and best) read as implicitly authorizing lending, in addition to importation, of all works other than audiovisual works." Brief for United States as *Amicus Curiae* 30, n. 6.

[23]Title 17 U. S. C. §109(c) provides: "Notwithstanding the provisions of section 106(5), the owner of a particular copy lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to display that copy publicly, either directly or by the projection of no more than one image at a time, to viewers present at the place where the copy is located."

a copyright owner's exclusive right under §106(5) to publicly display the owner's work. Because §109(c), like §109(a), applies only to copies "lawfully made under this title," *amici* contend that a ruling in Wiley's favor would prevent museums from invoking §109(c) with respect to foreign-made works of art. *Id.*, at 11–13.[24]

Limiting §109(c) to U. S.-made works, however, does not bar art museums from lawfully displaying works made in other countries. Museums can, of course, seek the copyright owner's permission to display a work. Furthermore, the sale of a work of art to a U. S. museum may carry with it an implied license to publicly display the work. See 2 Patry §5:131, at 5–280 ("[C]ourts have noted the potential availability of an implied nonexclusive licens[e] when the circumstances . . . demonstrate that the parties intended that the work would be used for a specific purpose."). Displaying a work of art as part of a museum exhibition might also qualify as a "fair use" under 17 U. S. C. §107. Cf. *Bouchat* v. *Baltimore Ravens Ltd. Partnership*, 619 F. 3d 301, 313–316 (CA4 2010) (display of copyrighted logo in museum-like exhibition constituted "fair use").

The Court worries about the resale of foreign-made consumer goods "contain[ing] copyrightable software programs or packaging." *Ante*, at 21. For example, the Court observes that a car might be programmed with diverse forms of software, the copyrights to which might be owned by individuals or entities other than the manufacturer of the car. *Ibid.* Must a car owner, the Court asks, obtain permission from all of these various copyright owners before reselling her car? *Ibid.* Although this question strays far from the one presented in this case and briefed by the parties, principles of fair use and implied

---

[24] The word "copy," as it appears in §109(c), applies to the original of a work of art because the Copyright Act defines the term "copies" to "includ[e] the material object . . . in which the work is first fixed." §101.

license (to the extent that express licenses do not exist) would likely permit the car to be resold without the copyright owners' authorization.[25]

Most telling in this regard, no court, it appears, has been called upon to answer any of the Court's "horribles" in an actual case. Three decades have passed since a federal court first published an opinion reading §109(a) as applicable exclusively to copies made in the United States. See *Columbia Broadcasting System, Inc.* v. *Scorpio Music Distributors, Inc.*, 569 F. Supp. 47, 49 (ED Pa. 1983), summarily aff'd, 738 F. 2d 424 (CA3 1984) (table). Yet Kirtsaeng and his supporting *amici* cite not a single case in which the owner of a consumer good authorized for sale in the United States has been sued for copyright infringement after reselling the item or giving it away as a gift or to charity. The absence of such lawsuits is unsurprising. Routinely suing one's customers is hardly a best business

---

[25] Principles of fair use and implied license may also allow a U. S. tourist "who buys a copyrighted work of art, a poster, or . . . a bumper sticker" abroad to publicly "display it in America without the copyright owner's further authorization." *Ante*, at 15. (The tourist could lawfully bring the work of art, poster, or bumper sticker into the United States under 17 U. S. C. §602(a)(3)(B), which provides that §602(a)(1)'s importation ban does not apply to "importation . . . by any person arriving from outside the United States . . . with respect to copies . . . forming part of such person's personal baggage."). Furthermore, an individual clearly would not incur liability for infringement merely by displaying a foreign-made poster or other artwork in her home. See §106(5) (granting the owners of copyrights in "literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works" the exclusive right "to display the copyrighted work *publicly*" (emphasis added)). See also §101 (a work is displayed "publicly" if it is displayed "at a place open to the public or at any place where a substantial number of persons *outside of a normal circle of a family and its social acquaintances* is gathered" (emphasis added)). Cf. 2 Nimmer §8.14[C][1], at 8–192.2(1) ("[A] performance limited to members of the family and invited guests is not a public performance." (footnote omitted)).

practice.[26]  Manufacturers, moreover, may be hesitant to
do business with software programmers taken to suing
consumers.   Manufacturers may also insist that soft-
ware programmers agree to contract terms barring such
lawsuits.

   The Court provides a different explanation for the
absence of the untoward consequences predicted in its
opinion—namely, that lower court decisions regarding the
scope of §109(a)'s first sale prescription have not been
uniform.  *Ante*, at 23.  Uncertainty generated by these
conflicting decisions, the Court notes, may have deterred
some copyright owners from pressing infringement claims.
*Ante*, at 23–24.  But if, as the Court suggests, there are a
multitude of copyright owners champing at the bit to bring
lawsuits against libraries, art museums, and consumers in
an effort to exercise perpetual control over the down-
stream distribution and public display of foreign-made
copies, might one not expect that at least a handful of such
lawsuits would have been filed over the past 30 years?
The absence of such suits indicates that the "practical
problems" hypothesized by the Court are greatly exagger-
ated.  *Ante*, at 24.[27]  They surely do not warrant disregard-

——————

   [26] Exerting extensive control over secondary markets may not always
be in a manufacturer's best interest.  Carmakers, for example, often
trumpet the resale value of their vehicles.  See, *e.g.*, Nolan, UD grad
leads Cadillac marketing, Dayton Daily News, Apr. 2, 2009, p. A8
("Cadillac plays up its warranty coverage and reliable resale value to
prospective customers.").  If the transaction costs of reselling vehicles
were to rise, consumers' perception of a new car's value, and thus the
price they are willing to pay for such a car, might fall—an outcome
hardly favorable to automobile manufacturers.

   [27] It should not be overlooked that the ability to prevent importation
of foreign-made copies encourages copyright owners such as Wiley to
offer copies of their works at reduced prices to consumers in less devel-
oped countries who might otherwise be unable to afford them.  The
Court's holding, however, prevents copyright owners from barring the
importation of such low-priced copies into the United States, where
they will compete with the higher priced editions copyright owners

ing Congress' intent, expressed in §602(a)(1), to grant copyright owners the authority to bar the importation of foreign-made copies of their works. Cf. *Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.*, 530 U. S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (internal quotation marks omitted)).

## VI

To recapitulate, the objective of statutory interpretation is "to give effect to the intent of Congress." *American Trucking Assns.*, 310 U. S., at 542. Here, two congressional aims are evident. First, in enacting §602(a)(1), Congress intended to grant copyright owners permission to segment international markets by barring the importation of foreign-made copies into the United States. Second, as codification of the first sale doctrine underscores, Congress did not want the exclusive distribution right conferred in §106(3) to be boundless. Instead of harmonizing these objectives, the Court subordinates the first entirely to the second. It is unsurprising that none of the three major treatises on U. S. copyright law embrace the Court's construction of §109(a). See 2 Nimmer §8.12[B][6][c], at

---

make available for sale in this country. To protect their profit margins in the U. S. market, copyright owners may raise prices in less developed countries or may withdraw from such markets altogether. See Brief for United States as *Amicus Curiae* 26; Brief for Text and Academic Authors Association as *Amicus Curiae* 12; Brief for Association of American Publishers as *Amicus Curiae* 37. See also Chiappetta 357–358 (a rule of national exhaustion "encourages entry and participation in developing markets at lower, locally more affordable prices by eliminating them as risky sources of cheaper parallel imports back into premium markets"). Such an outcome would disserve consumers—and especially students—in developing nations and would hardly advance the "American foreign policy goals" of supporting education and economic development in such countries. *Quality King* Brief 25–26.

GINSBURG, J., dissenting

8–184.34 to 8–184.35; 2 Goldstein §7.6.1.2(a), at 7:141; 4 Patry §§13:22, 13:44, 13:44.10.

Rather than adopting the very international-exhaustion rule the United States has consistently resisted in international-trade negotiations, I would adhere to the national-exhaustion framework set by the Copyright Act's text and history. Under that regime, codified in §602(a)(1), Kirtsaeng's unauthorized importation of the foreign-made textbooks involved in this case infringed Wiley's copyrights. I would therefore affirm the Second Circuit's judgment.